**In re UNITED STATES AIR FORCE TEXAS TOWER NO. 4.**

**Petition of the UNITED STATES of America, as owner of the United States Air Force Texas Tower No. 4, a public vessel of the United States, for exoneration from or limitation of liability.**

United States District Court
S. D. New York.

March 9, 1962.

Robert M. Morgenthau, U. S. Atty., New York City, Louis E. Greco, Attorney in Charge Admiralty & Shipping Section, Department of Justice, New York City, by Gilbert S. Fleischer, New York City, of counsel, for petitioner.

Whitman, Ransom & Coulson, New York City, Forbes D. Shaw, Paul M. O'Connor, Jr., New York City, of counsel, for claimant Moran, Proctor, Mueser & Rutledge.

Nevius, Jarvis & Pilz, New York City, Macklin, Speer, Hanan & McKernan, New York City, by Charles J. Carroll, Jr., New York City, of counsel, for claimants J. Rich Steers, Inc. and Morrison Knudsen Co., Inc.

᛫ LEVET, District Judge.

These are motions for summary judgment, filed by claimants J. Rich Steers, Inc., Morrison Knudsen Co., Inc. and Moran, Proctor, Mueser & Rutledge, pursuant to Supreme Court Admiralty Rule 58, 28 U.S.C. They seek to dismiss the petition for limitation of liability, filed by the United States of America, on the ground that Texas Tower No. 4 was not a "vessel" within the meaning and purview of the provisions of Sections 4283–4289 of the Revised Statutes of the United States (46 U.S.C.A. §§ 183–189). In the alternative, claimants move the court to issue an order containing a specification of the facts controverted.

*FACTS*

█ United States Air Force Texas Tower No. 4 (hereinafter referred to as "Tower") was one of three novel and unique radar tower installations erected on the continental shelf off the North Atlantic coast of the United States as permanent and integral parts of the nation's radar defense network. (Affidavit of Rutledge, Moran, Proctor, Mueser & Rutledge, January 3, 1962, p. 1.)

On the evening of January 15, 1961, at approximately 7:25 P.M., during a North Atlantic storm, the Tower collapsed in 185 feet of water, resulting in the death of 28 persons, of whom 14 were civilian repairmen and 14 were military personnel attached to the United States Air Force. (Affidavit of Gilbert S. Fleischer, Department of Justice, United States, January 22, 1962, p. 2.)

The Tower was located 80 miles east of Barnegat Inlet, New Jersey (84 miles southeast of Coney Island, New York). (Affidavit of E. G. Rau, J. Rich Steers, Inc., January 5, 1962, pp. 4–5.)

The contract for the building of the Tower stated that the work would consist of constructing on the shore, towing to sea, and the implanting on the ocean floor a large steel self-contained stable platform. This structure was to include adequate living facilities for personnel, all required mechanical and electrical services for the operation and maintenance of the platform and its equipment, all gear and equipment for replenishment and fueling, helicopter landing and take-off, boat launching and retrieve, and life-saving. The Tower was to be raised some 70 feet above mean sea level and to be supported on three steel caissons partially filled with concrete and about 12 feet and 14 feet in diameter. (Affidavit of E. G. Rau, January 5, 1962, p. 5.)

The Tower was in 185 feet of water. Each of its three legs was 252 feet long and 12½ feet in diameter, made of $^{13}/_{16}$ inch steel plate and braced by three tiers of 24 and 30 inch steel struts. The superstructure was a triangular platform, 66½ feet above sea level, approximately 180 feet on each side. The weight of the Tower was some 7,000 tons. Its height from the ocean floor to the top of the "radomes" was 345 feet. (Affidavit of E. G. Rau, January 5, 1962, p. 6, citing Transcript of Hearings of Senate Investigating Committee, p. 7.)

The platform and the three legs which were designed to support the platform were towed to the projected site. The legs were placed in their position at the Tower site. The platform was floated into position between the legs. On July 8, 1957 the platform was jacked up on the three legs, clear of the water. The legs were embedded into solid concrete caissons some 25 feet in diameter and 20 feet in depth. (Affidavit of E. G. Rau, January 5, 1962, p. 6, citing Transcript of Hearings of Senate Investigating Committee, pp. 53–56.)

The Tower was designed to be fabricated in a shipyard and towed to its site in two floating sections. The superstructure or platform floated during the tow. The substructure, also referred to as the template, was designed to float as a separate unit by means of the

buoyancy provided within the cylindrical caissons and bracing members. (Statement of James R. Ayers, Department of the Navy, p. 1; affidavit of Gilbert S. Fleischer, January 22, 1962, p. 2.)

The Tower was towed to its station in the ocean, a towing distance of 350 miles. It had a draft of between 6–7 feet and was towed by two sea-going tugs. (Affidavit of Gilbert S. Fleischer, January 22, 1962, p. 3.)

## GOVERNMENT'S PETITION FOR LIMITATION OF LIABILITY

On July 18, 1961, a petition for exoneration from or limitation of liability of the United States of America, as owner of the Tower, was filed in this court. It is alleged in Article TENTH of the petition that, after the casualty, the Tower was a total loss. In Article ELEVENTH of the petition, it is alleged that the amount demanded in the suits filed against petitioner pending in this court far exceeds the value of its interest in the Tower. Subsequent to the filing of said petition, an order directing the issuance of monition and enjoining all suits was entered on July 18, 1961 and served upon the various parties. Publication of the notice of monition was made in the New York Law Journal and, pursuant to order, completed on September 6, 1961. Claims have since been filed and the total amount filed to date in the limitation proceeding is in the sum of $5,208,514.74. (Memorandum of United States, filed January 22, 1962, pp. 3–4.)

The movants herein filed exceptions and exceptive allegations to the petition, which came on before District Judge Charles M. Metzner, who overruled same by memorandum opinion dated November 14, 1961, holding that the proper remedy was to move for summary judgment under Admiralty Rule 58.

## ISSUES

The issues are as follows:

1. Do the nature, characteristics and purpose of the special purpose structure, Tower, present a genuine issue of fact to be resolved at a trial or on a hearing?

2. Is the government, as owner of the Tower, entitled to the benefits of the limitation statute, 46 U.S.C.A. §§ 183–189?

## DISCUSSION

I hold that there is no genuine issue of material facts in dispute which would require such issue to be resolved at a trial or on a hearing.

The basic issue before this court is whether the Tower was a "vessel" within the meaning and purview of the limitation of liability statute, 46 U.S.C.A. §§ 183–189.

Generally, the definition of "vessel" "includes every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water." 1 U.S.C. § 3.

In defining "vessel," Gilmore and Black, The Law of Admiralty §§ 1–11 (1957), states: "[T]he best approximation would be to say that the term 'vessel' is applied to floating structures capable of transporting something over the water."

Another definition states:

" * * * By statutory definition the word vessel includes every description of water craft used or capable of being used as a means of transportation on water. For general admiralty purposes the definition has not always been the same as that for the purpose of applying some particular statute. Also, the question whether a given structure is or is not a vessel often depends on its particular use. It may be a 'shore structure' if used as a dance hall, hotel or wharf boat permanently moored to the shore. The mere fact that the structure floats on navigable waters is not determinative of its status as a vessel. An air vehicle, when floating on the water, has in some cases been held to be a 'vessel' for admiralty purposes." Robinson, Admiralty § 8 (1939).

In the case of Petition of Kansas City Bridge Co., D.C.W.D.Mo.1937, 19

F.Supp. 419, the issue was whether a structure claimed by the petitioner to be a "vessel" within the meaning of that word as used in Title 46 U.S.C.A. § 183, was a "vessel." The court stated: "We do not suppose, however, that this statutory definition is to be taken literally, since any contrivance that will float on water is *capable* of being used as a means of transportation (of things or persons) on water. The word 'capable' in the statutory definition is to be read 'practically capable.' Evansville, etc., Co. v. Chero Cola Bottling Co., 271 U.S. 19, 22, 46 S.Ct. 379, 380, 70 L.Ed. 805."

In Cope v. Vallette Dry Dock Co., 1887, 119 U.S. 625, 7 S.Ct. 336, 30 L.Ed. 501, a case involving a libel for salvage, the court pointed out:

"We have no hesitation in saying that the decree of the circuit court was right. A fixed structure, such as this dry-dock is, not used for the purpose of navigation, is not a subject of salvage service, any more than is a wharf or a warehouse when projecting into or upon the water. The fact that it floats on the water does not make it a ship or vessel, and no structure that is not a ship or vessel is a subject of salvage. A ferry-bridge is generally a floating structure, hinged or chained to a wharf. This might be the subject of salvage as well as a dry-dock. A sailor's floating bethel, or meeting-house, moored to a wharf, and kept in place by a paling of surrounding piles, is in the same category. It can hardly be contended that such a structure is susceptible of salvage service. * * * [p. 627, 7 S.Ct. p. 337.]

\* \* \* \* \* \*

"It is true that the terms 'ships and vessels' are used in a very broad sense, to include all navigable structures intended for transportation. * * * [p. 629, 7 S.Ct. p. 337.]

" * * * We think no case can be found which would construe the terms to include a dry-dock, a float-ing-bridge, or meeting-house, per-manently moored or attached to a wharf." (p. 630, 7 S.Ct. p. 338.)

A case specifically under the limitation statute was Evansville, etc., Co. v. Chero Cola Co., 1926, 271 U.S. 19, 46 S. Ct. 379, 70 L.Ed. 805, where a petition in admiralty for limitation of liability was filed. The court there stated:

"The rule of limited liability of owners of vessels is an ancient one. It has been administered in the courts of admiralty in Europe from time immemorial and by statute applied in England for nearly two centuries. See Providence & New York S. S. Co. v. Hill Mfg. Co., [3 S.Ct. 379, 617] 109 U.S. 578, 593 [27 L.Ed. 1038]; The Main v. Williams, [14 S.Ct. 486] 152 U.S. 122, 127 [38 L.Ed. 381]. Our statutes establishing the rule were enacted to promote the building of ships, to encourage the business of navigation, and in that respect to put this country on the same footing with other countries. See Moore v. American Transportation Co., 24 How. 1, 39 [16 L.Ed. 674]; Norwich [& N. Y. Transp.] Co[mpany] v. Wright, 13 Wall. 104, 121 [20 L.Ed. 585]. The rule should be applied having regard to the purposes it is intended to subserve and the reasons on which it rests.

"The only question presented is whether appellant's wharfboat was a 'vessel' at the time it sank. It was an aid to river traffic, but it was not used to carry freight from one place to another. It was not practically capable of being used as a means of transportation. It served at Evansville as an office, warehouse and wharf, and was not taken from place to place. The connections with the water, electric light and telephone systems of the city evidence a permanent location. It performed no function that might not have been performed as well by an appropriate structure on the land and by a floating stage or platform permanently attached to the land. It did not en-

counter perils of navigation to which craft used for transportation are exposed. There appears to be no reason for the application of the rule of limited liability. * * *" (pp. 21–22, 46 S.Ct. p. 380.)

Judge Cardozo in Matter of Reinhardt v. Newport Flying Service Corp., 1921, 232 N.Y. 115, 118, 133 N.E. 371, 372, 18 A.L.R. 1324, in defining "vessel" pointed out that it includes "anything upon the water where movement is predominant rather than fixity or permanence."

■ Thus, we see that some of the elements as to whether a structure or object is a "vessel" are as follows: Whether it is used or capable of being used as a means of transportation; whether it is capable of transferring something over the water; whether it is used for the purpose of navigation. In Evansville, etc., Co. v. Chero Cola Co., supra, a case dealing with limitation of liability, the specific question involved was whether the object or structure *at the time it sank* was a vessel. This case considered such factors as (a) use to carry freight from one place to another; (b) use as a means of transportation; (c) the permanence of location; (d) the perils of navigation to which craft used for transportation are exposed.

It is evident that the Tower was not a "vessel." Certainly, there was no intention that this structure be used as a means of transportation. Nor was it used for the purpose of navigation. It was not a structure used to carry freight from one place to another. In addition, its intended permanence of location is obvious. Although the Tower was subject to the perils of the sea, it was not so subject in a navigational sense.[1]

The fact that the Tower was floated to its position does not make it a "vessel." At the time the Tower collapsed, it is fair to say that its location was presumably permanent. The government affidavit states that the Tower was "being used in place of the picket ships which had formerly served as a seaward extension of the early warning radar system in the Continental Air Defense program." (Affidavit of Gilbert S. Fleischer, January 22, 1962, p. 2.) The reason for the use of the Tower was that the "tactical considerations which preponderated in favor of the construction of these towers when the proposal was first advanced envisaged a radar site fixed in position and of consequent greater value in the evaluation of radar intelligence than any mobile station, whether plane or ship. 'In addition, the locations of Texas Towers were exactly known and hence their data was considerably more precise than that gathered from mobile stations.' (Transcript of Hearings of Senate Investigating Committee, p. 4.)" (Affidavit of E. G. Rau, January 5, 1962, pp. 5–6.) The very reason for building these structures was that of *permanence*, as contrasted with mobility.

The government contends that the *platform* could have been lowered to the ocean surface and floated away to a new site. (Affidavit of Gilbert S. Fleischer, January 22, 1962, p. 5.) The government is thus attempting to label a part of the Tower as a "vessel" due to the fact that the platform floated to its position. The Tower did not exist until its components were erected and assembled. When erected and assembled the Tower had the attribute of permanence. The fixed nature of this Tower is incongruous to the concept of mobility. Merely because a component of the Tower had or has the potential ability to float does not constitute the Tower a "vessel."

The United States contends that Grimes v. Raymond Concrete Pile Co., 1958, 356 U.S. 252, 78 S.Ct. 687, 2 L.Ed. 2d 737, which involved a Texas Tower being constructed on Georges Bank, 110 miles east of Cape Cod, is dispositive of the issue in this matter. The Grimes case is clearly distinguishable and inap-

1. Definition of "navigation": "The act or the science or the business of traversing the sea or other waters in ships or vessels [citations omitted]." Black, Law Dictionary (4th ed. 1951).

plicable to the matter now before this court.

The district court in Grimes directed a verdict for the defendants. The trial judge held that the plaintiff's exclusive remedy was under the Defense Bases Act, 42 U.S.C.A. §§ 1651–1654, which incorporates the remedies of the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C.A. §§ 901–950. The Court of Appeals for the First Circuit held that the Defense Bases Act did not provide the exclusive remedy for a member of a crew in light of Section 1654 of the Act. However, the Court of Appeals affirmed the district court's judgment upon the ground that the evidence was not sufficient to create a fact question as to whether the petitioner was a crew member.

The facts brought out at the trial were as follows:

"The plaintiff was hired by the defendants on or about June 21, 1955. Thereafter, he worked on the Tower in East Boston for about three weeks, where it was being raised 'to put on guide wells underneath the permanent legs.' On July 11, 1955 he entered into a written employment contract with the defendants to work on the construction of the Tower at Georges Bank. Subsequently, the Tower was towed and pushed by tug boats to Georges Bank. On or about July 26, 1955, six days after the Tower had arrived at the site of its permanent location, the plaintiff was injured while returning to the Tower from a nearby tug by means of a 'Navy life ring,' after having worked for a few hours on a barge which carried sand and gravel for the Tower." Grimes v. Raymond Concrete Pile Company, 1 Cir. 1957, 245 F.2d 437, 438.

In directing a verdict for defendant, the trial judge stated:

" 'I am quite clear that in this particular case the defendants had a defense bases contract with respect to Tower No. 2 with the Navy Department of the United States. The plaintiff was hired in connection with that work. At the time of his injury he was on a barge or, rather, returning from a trip on a barge which had been doing preparatory and ancillary work in connection with Texas Tower No. 2. His remedy was under the Longshoremen and Harbor Workers Act [Defense Bases Act] [sic]. His remedy is not by a suit in this court under the Jones Act, even though were he working for another employer or an employer not having a defense bases contract, I would agree that he might be regarded as a member of the crew of the barge and entitled, under those circumstances, to the usual remedies, such as the Jones Act, available to maritime employees.' " Grimes v. Raymond Concrete Pile Company, supra.

Thus, plaintiff was injured after having worked for a few hours on a *barge* and the trial judge pointed out that plaintiff might be regarded as a member of the crew of the *barge*.

The Court of Appeals, per curiam, reasoned that "Assuming that his transitory assignment to do work on the barge made appellant for a brief six-hour period an informal member of the crew of such barge, it could not possibly be said that he was injured in the course of his employment as such crew member, for his work on the barge was all through, and he was injured while being transferred from the tug back to the Texas Tower. Furthermore, appellant's presence on the barge was only sporadic or temporary, not measuring up to the requirement of 'a more or less permanent connection between the ship and the worker'; this, under established law, prevents appellant from being considered a member of the crew of the barge. [citations omitted]" Grimes v. Raymond Concrete Pile Company, 1 Cir. 1957, 245 F.2d 437, 440. Again we see that the discussion centers about whether Grimes was a member of the crew of the *barge*. In fact, the Appeals Court clearly asserted that if con-

ceivably the Texas Tower could have been considered a "vessel" while being towed to its permanent installation site, it certainly ceased to be a vessel at the time of the accident.

The Supreme Court in Grimes held:

"We hold, in agreement with the Court of Appeals, that 42 U.S.C. § 1654, 42 U.S.C.A. § 1654, saves the remedy under the Jones Act, created for a member of a crew of any vessel. We hold further, however, in disagreement with the Court of Appeals, that the petitioner's evidence presented an evidentiary basis for a jury's finding whether or not the petitioner was a member of a crew of any vessel. Senko v. La Crosse Dredging Corp., 352 U.S. 370 [77 S. Ct. 415, 1 L.Ed.2d 404]; Gianfala v. Texas Co., 350 U.S. 879 [76 S.Ct. 141, 100 L.Ed. 775]; South Chicago [Coal & Dock] Co. v. Bassett, 309 U.S. 251 [60 S.Ct. 544, 84 L.Ed. 732]." Grimes v. Raymond Concrete Pile Co., 1958, 356 U.S. 252, 253, 78 S.Ct. 687, 688, 2 L.Ed.2d 737.

The United States contends that it follows that the present controversy involves factual issues. It is pertinent to state that the Supreme Court in discussing whether plaintiff was a member of a crew of any vessel does not state whether the vessel was the barge or the Tower. The opinion is silent as to whether the Tower might be considered a vessel.

However, in the dissent by Mr. Justice Harlan, whom Mr. Justice Whittaker joins, it is asserted:

"On these facts I am unable to see how a jury could permissibly find petitioner to be a 'member of a crew of any vessel' under any sensible meaning of that phrase. *Presumably the Court does not consider as a vessel this man-made island, the Texas Tower, which was securely fixed to the ocean bed before petitioner was injured.* I find equally untenable the other possible basis for the Court's action—that petitioner's

sporadic work for a few hours on the barge, a minor incident to his continuing employment as a pile driver on the tower, could be found to transform him at the time of the accident into a seaman and a member of the crew of the barge. If the 'standing' requirements of the Jones Act are still to be regarded as having any real content, I can find no room for debate that this individual is not a seaman, unless a 'seaman' is to mean nothing more than a person injured while working at sea. We should give effect to the law as Congress has written it." (Emphasis added.) Grimes v. Raymond Concrete Pile Co., 1958, 356 U.S. 252, 255, 78 S.Ct. 687, 689, 2 L.Ed. 2d 737.

In Texas Company v. Savoie, 5 Cir. 1957, 240 F.2d 674, cert. denied, 1957, 355 U.S. 840, 78 S.Ct. 49, 2 L.Ed.2d 51, the court pointed out that the deceased, who was blown off a "well platform," was "employed to work on the platforms, not on the vessel."

Regarding the government's assertion that the Supreme Court's decision in Grimes makes the claimants' motion for summary judgment an issue of fact, Offshore Company v. Robison, 5 Cir. 1959, 266 F.2d 769, 778, 75 A.L.R.2d 1296, states:

"Appellants in the instant case— correctly, we think [footnote omitted]—take the position that the traditional function of court and jury still obtains, in spite of the Gianfala to Grimes-Butler series of cases, and that a court, trial or appellate, may in the proper case hold that there is no reasonable evidentiary basis to support a jury finding that an injured person is a seaman and member of a crew of a vessel under the Jones Act. They contend that this is such a case and rely on Texas Company v. Savoie, 5 Cir., 1957, 240 F.2d 674, 675, rehearing denied 5 Cir., 242 F.2d 667, 668, certiorari denied 355 U.S. 840, 78 S.Ct. 49, 2 L.Ed.2d 51."

The Grimes case deals with the interpretation of the Jones Act. The fact that a tower may be regarded as a vessel under the Jones Act does not necessarily make it a vessel under the limitation statute. The Jones Act has been liberally interpreted regarding the definition of a vessel. The Offshore Company case, supra, points this out when it states:

"* * * The Act has always been construed liberally, but recent decisions have expanded the coverage of the Jones Act to include almost any workman sustaining almost any injury while employed on almost any structure that once floated or is capable of floating on navigable waters. * * * [p. 771.]

* * * * * *

"Expansion of the terms 'seaman' and 'vessel' are consistent with the liberal construction of the Act that has characterized it from the beginning and is consistent with its purposes. Within broad limits of what is reasonable, Congress has seen fit to allow juries to decide who are seamen under the Jones Act. * * *" (p. 780.)

The Offshore Company case, supra, in its discussion of *Jones Act* requirements points out that there are "special purpose structures not usually employed as a means of transport by water but designed to float on water." Such structures as a "submersible barge," "derrick," and "dredge" are discussed. (p. 776.) However, none of these are permanent structures. An example of a permanent structure is the well platform in the Savoie case, supra. This distinction is clearly stated in the Offshore Company case:

"The Savoie case is not this case. There was no showing that Savoie performed any duties on the lugger; he was a passenger on a water-taxi. *His duties related entirely to work on permanently fixed well platforms.* Robison was attached, permanently, to Offshore No. 55. *Offshore No. 55 is not a man-made island.* Like the submersible barge in Gianfala, Offshore No. 55 was a special purpose vessel, a floating drilling platform. * * *" (Emphasis added.) (p. 779.)

The Tower in this case is a "man-made island."

The government asserts that "It is well established that this statute limiting liability is to be liberally construed in favor of shipowners." (Memorandum of the United States, filed January 22, 1962, p. 17.) However, to consider the Tower a "vessel" would be a departure from the realm of liberality and of reality and would result in a misconstruction of the limitation statute.

The United States states that the death claimants allege in their libels that the Tower was a vessel. It must again be pointed out that this is a limitation proceeding. The fact that the death claimants *allege* that the Tower was a vessel under the Public Vessels Act involves the meaning of the term "vessel" under another act whose purpose is not the limitation of liability. As to whether the Tower was a "vessel" under the Public Vessels Act is not in issue here.

There are repeated references to the existence of a voyage in Admiralty Rule 51, 28 U.S.C. This rule concerns the method of claiming limitation of liability. The requirement of a voyage is enunciated in Wong v. Utah Home Fire Insurance Company, D.C.D.Hawaii, 1958, 167 F.Supp. 230, 235, where the court states that "* * * the limitation of liability is limited to limitation for disasters occurring on a particular voyage, and for such damage or loss as the owner sustained on the last voyage preceding the filing of the petition, or on the voyage on which the vessel is lost. The Snug Harbor, D.C., 53 F.2d 407, at page 412." Certainly, from the time the Tower was affixed to the bottom of the ocean floor no voyage had occurred.

I conclude that the Tower is not a "vessel" within the meaning and purview of the provisions of Sections 4283–4289 of the Revised Statutes of the United States (46 U.S.C.A. §§ 183–189). As a

result, the petition of the United States of America, as owner of the United States Air Force Texas Tower No. 4, for exoneration from or limitation of liability, is dismissed.

There is no genuine issue as to any material fact and the moving parties are entitled to a judgment as a matter of law. Summary judgment granted.

Settle order and judgment on notice.