In the Matter of the Complaint of SEDCO, INC., as Owner of the Mobil Drilling Unit Sedco 135, its Engines, Tackle, Apparel, etc., in a Cause of Exoneration from or Limitation of Liability.

Civ. A. Nos. H–79–1880, H–79–1982, H–79–2157, H–79–2389, H–79–2436 and H–81–120.

United States District Court, S. D. Texas.

March 30, 1982.

Theodore C. Dimitry, Eugene Silva, H. S. Morgan, Harold Watson, Vinson & Elkins, Francis Spagnoletti, Houston, Tex., for Sedco, Inc., petitioner.

Ted Hirtz, B. D. Daniel, Dave Elmers, Hirtz & McDonough, Houston, Tex., for Permargo.

Finis E. Cowan, Joseph Cheavens, Baker & Botts, Thomas Matlock, Houston, Tex., for Pemex.

Joseph D. Jamail, Richard Mithoff, Jamail & Kolius, Houston, Tex., for George F. Haylock, et al.

W. James Kronzer, Kronzer, Abraham & Watkins, Houston, Tex., Rollins M. Koppel, Michael Ezell, Koppel, Ezell & Deane, Harlingen, Tex., Roger Robinson, Raymondville, Tex., Paul Cunningham, Jr., South Padre Island, Tex., for Willacy County Navigation Dist., et al.

Sidney Ravkind, Mandell & Wright, Houston, Tex., Richard C. Arroyo, Brownsville, Tex., for Troy Giles, et al.

Douglas Caroom, Ken Cross, Austin, Tex., for Mark White, etc., et al.

William Robins Brice, Royston, Rayzor, Vickery & Williams, Houston, Tex., for Exploration Loggins, S. A.

Jack Shepherd, Asst. U. S. Atty., Houston, Tex., Wells D. Burgess, Charles W. Findlay, Washington, D. C., for United States of America.

Michael R. Ezell, Koppel, Ezell & Deane, Harlingen, Tex., Jack G. Carinhas, Jr., Carinhas, Dale & Morros, Brownsville, Tex., for AHCO, Inc., et al.

Norbert John Wilcox, pro se and for Terree Ann Wilcox.

**564**

Isabel C. Pelton, interpreter.

### MEMORANDUM AND ORDER

O'CONOR, District Judge.

#### Introduction

The 1979 IXTOC I well disaster in the Bay of Campeche has produced a tangle of litigation. Before the Court, at this time, is a series of jurisdictional issues which must be untangled before discovery on the merits can begin. Each of these issues has been exhaustively briefed and oral argument by the parties was heard on October 5, 1981 and on December 14–15, 1981. The Court will consider each of these issues individually.

#### Pemex

Petroleos Mexicanos (Pemex), which is both a direct defendant to certain private and public plaintiffs and a third party defendant to claims asserted by Sedco, has moved to be dismissed from all claims on the basis of the grant of sovereign immunity provided by the Foreign Sovereign Immunity Act, 28 U.S.C. § 1602 et seq. (FSIA). By asserting this motion, Pemex alleges that this Court lacks jurisdiction to hear claims based upon acts purportedly done in its capacity as a foreign sovereign. The issues raised by such a motion strike to the very heart of the international nature of the IXTOC I disaster.

Federal courts generally have jurisdiction over actions against foreign states pursuant to 28 U.S.C. § 1330(a). This section provides that original subject matter jurisdiction lies in federal district courts "as to any claim for relief in personam with respect to which the foreign state is not entitled immunity under the [FSIA] or under any applicable international agreement." Personal jurisdiction over the foreign state is achieved through service of process under 28 U.S.C. § 1608 which provides for special service through international channels. 28 U.S.C. § 1330(b). In the present consolidated action, Pemex has not attacked the manner of service but, instead, has stridently asserted that it may avail itself of the immunity granted by the FSIA. 28 U.S.C. § 1604.

Prior to the passage of the FSIA, the doctrine of foreign sovereign immunity underwent a transformation. Initially, a foreign state was absolutely immune to suit in the Courts of the United States because a sovereign could not sit in judgment over an equal. *Schooner Exchange v. M'Faddon*, 11 U.S. (7 Cranch) 116, 3 L.Ed. 287 (1812). Gradually, a more restrictive view of the immunity evolved and was adopted by the United States State Department in 1952 through the now famous Tate letter. This restrictive view held foreign states accountable in U.S. courts for their private acts (jure gestionis) while they remained immune for their public acts (jure imperii). In pre-FSIA cases, courts often deferred to the State Department recommendation concerning immunity, *see e.g., Republic of Mexico v. Hoffman*, 324 U.S. 30, 65 S.Ct. 530, 89 L.Ed. 729 (1945); *Spacil v. Crowe*, 489 F.2d 614 (5th Cir. 1974), creating an inconsistent utilization of the doctrine. To alleviate this problem and to regularize the standards used by the judiciary in determining the scope of foreign sovereign immunity, Congress passed the FSIA in 1976. *See generally* Report of House Judiciary Committee Nos. 94–1487, *reprinted in* [1976] U.S.Code Cong. & Admin.News 6604. (House Report).

Generally, the statute grants immunity to foreign states and their agencies or instrumentalities, 28 U.S.C. § 1604. It thereafter creates five exceptions to this grant of immunity, of which two have been asserted by Plaintiffs in the present case: the "commercial activity" exception 1605(a)(2); and the "noncommercial tort" exception 1605(a)(5). Once a basis for jurisdiction is alleged, the burden of proof rests on that foreign state to demonstrate that immunity should be granted. *Arango v. Guzman Travel Advisors Corp.*, 621 F.2d 1371, 1378 (5th Cir. 1980).

#### Section 1605(a)(2)—Commercial Activity Exception

Foreign states are denied immunity where they step down from their sovereign

status and engage in commercial activity. The third clause of § 1605(a)(2), applicable here, requires that the lawsuit be based on acts in connection with commercial activity performed outside the United States which has direct effects in the United States. Therefore, this Court must first determine if Pemex is an agency or instrumentality of Mexico. If it is so found, the Court must then consider whether the acts of Pemex made the basis of this lawsuit were done in connection with commercial activity as contemplated by the act. Finally, if commercial in nature, the Court must determine whether the acts directly affected the United States.

Petroleos Mexicanos was created in 1938 as a decentralized governmental agency charged with the exploration and development of Mexico's hydrocarbon resources. Unlike in the United States, the government of Mexico owns its country's natural resources, in particular, its hydrocarbon deposits. Mex. Political Const. art. 27. The Regulatory Law passed pursuant to the Mexican Constitution specifically creates a national oil company, Pemex, to implement the National Development Plan for hydrocarbon resources. Pemex is not privately owned and is governed by a council (Consejo de Administracion) composed of Presidential appointees. Decisions made by the governing council are made in furtherance of Mexican National policy concerning its Petroleum resources. Beyond a doubt, Pemex is a "foreign state" as contemplated by § 1603(a) of the FSIA. *See Carey v. National Oil Corp.,* 592 F.2d 673 (2nd Cir. 1979) (holding the government owned Libyan oil corporation was a foreign state for purpose of FSIA.)

Whether Pemex was engaged in commercial activity when it performed the acts complained of by Plaintiffs in this lawsuit is a difficult issue. The statute generally defines "commercial activity" as:

a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose.

28 U.S.C. § 1603(d). Undeniably, Pemex, as a national oil company, engages in a substantial amount of commercial activity. *See e.g., S. T. Tringali Co. v. The Tug Pemex XV,* 274 F.Supp. 227 (S.D.Tex.1967). However, this Court must focus on the specific acts made the basis of the present lawsuit in applying the FSIA. It is whether these particular acts constituted or were in connection with commercial activity, regardless of the defendant's general commercial or governmental nature that is in issue. *Arango, supra* at 1379; *Yessenin Volpin v. Novosti Press Agency,* 443 F.Supp. 849, 855–56 (S.D.N.Y.1978). The FSIA, unfortunately, provides little guidance in this determination, giving wide latitude to the judiciary to consider each case on its own facts. House Report, *supra* at 6615; *Texas Trading & Milling Corp. v. Federal Republic of Nigeria,* 647 F.2d 300, 308–09 (2nd Cir. 1981). Thus, this Court must decide whether the case before it is one which Congress intended it to hear.

■ There is little doubt that where a foreign nation enters into the world marketplace to purchase or sell goods, it has engaged in commercial activity for purposes of the FSIA. For example, in *Texas Trading, supra,* Nigeria entered into private contracts to purchase cement with companies throughout the world. Payment for the cement was based on a letter of credit arrangement between the Central Bank of Nigeria and Morgan Guaranty Trust Company of New York. The Second Circuit Court of Appeals concluded that a cause of action arising from the alleged breach of the cement contracts with American companies was the type of commercial activity envisioned by Congress when it enacted the FSIA. *Id.* at 310.

This is not to say that every act done by a foreign state which could be done by a private citizen in the United States is "commercial activity" under § 1605(a)(2). Such a world view unrealistically denies the existence of other types of governments and economic systems. In *Arango v. Guzman*

*Travel Advisors Corp., supra,* the Fifth Circuit Court of Appeals held that the Dominican Republic could be sued in federal court through its state airline, Dominicana, for breach of contract based on miscarriage and nonperformance of a vacation tour. *Id.* at 1380. However, the Dominican Republic could not be sued for the alleged tortious conduct of Dominicana employees, since they were impressed into service to enforce their country's immigration laws, which is a governmental activity. *Id.* at 1379. Similarly, in *Yessenin Volpin v. Novosti Press Agency,* 443 F.Supp. 849 (S.D.N.Y.1978), the court recognized that while a news agency, in general, engages in commercial activity, the state-run Soviet publication Novosti was acting as an organ of the government publishing official governmental commentary and, as such, was immune from suit for libel in the United States. *Id.* at 856.

■ While the existence of a contractual relationship is not essential to a finding of commercial activity by a foreign state, it is often indicative of such conduct. The term "commercial activity" could embrace worldwide shipping activities by a state-owned shipping company, *see In re Rio Grande Transport, Inc.,* 516 F.Supp. 1155 (S.D.N.Y. 1981), or the operation of a state-owned hotel. *See Harris v. VAO Intourist Moscow,* 481 F.Supp. 1056 (E.D.N.Y.1979). Torts committed by the foreign state in the absence of a commercial contract but in connection with this type of activity could be found to be commercial under the provisions of the FSIA and subject the foreign state to jurisdiction in United States federal courts.

■ Here, Pemex was engaged in drilling an exculpatory oil well in its patrimonial waters, the Bay of Campeche. The data derived from this exploration was integral to the Mexican government's long range planning and policy making process concerning the production and utilization of state-owned minerals. Such policy is not made by Pemex, but is formed by higher levels of government. Mexican law, however, mandates that Pemex gather information concerning these resources and create

programs to implement the six-year national development plan devised by the various government ministries and adopted by the President of Mexico. Pemex had not entered into a contract with anyone for the oil and gas produced from the IXTOC I well, nor had it contracted with a United States business to drill the well. In fact, Pemex was attempting to determine if deposits of oil and gas were located offshore under Campeche Bay. Acting by authority of Mexican law within its national territory and in intragovernmental cooperation with other branches of the Mexican government, Pemex was not engaged in commercial activity as contemplated by Congress in the FSIA when the IXTOC I well was drilled.

The FSIA requires the Court to focus on the specific act by a foreign state made the basis of the lawsuit. The Court must regard carefully a sovereign's conduct with respect to its natural wealth. A very basic attribute of sovereignty is the control over its mineral resources and short of actually selling these resources on the world market, decisions and conduct concerning them are uniquely governmental in nature. *International Association of Machinists and Aerospace Workers v. Organization of Petroleum Exporting Countries,* 477 F.Supp. 553, 567–69 (C.D.Cal.1979), *aff'd on other grounds,* 649 F.2d 1354 (9th Cir. 1981). Because the nature of Pemex' act in determining the extent of Mexico's natural resources was uniquely sovereign, this Court finds that the commercial activity exception to the FSIA, § 1605(a)(2), is inapplicable to the facts presented by this case.

*Section 1605(a)(5)—Noncommercial Tort Exception*

Alternatively, it is urged that this Court exercise jurisdiction over Pemex under the "noncommercial tort" exception to the FSIA, § 1605(a)(5). Section 1605(a)(5) provides that a suit for damages based on an alleged noncommercial tort committed by a foreign state in the United States is actionable in federal court. For jurisdiction to exist, the following must be shown: (1) a noncommercial act by the foreign state; (2)

causing personal injury or damages to, or loss of property; and (3) that the claim is not based upon the exercise of a discretionary function, or upon libel, slander, misrepresentation, or interference with contract rights.

■ Section 1605(a)(5) is silent with respect to where the noncommercial tort must occur for jurisdiction to exist. Plaintiffs argue the tort may occur, in whole or in part, in the United States, and that the tort occurs in the United States if the acts or omissions directly affect this country. This argument may be correct in other circumstances, *see Ohio v. Wyandotte Chemicals Corp.*, 401 U.S. 493, 91 S.Ct. 1005, 28 L.Ed.2d 258 (1971); however, legislative history appears to reject this theory with respect to the FSIA. In describing the purpose of § 1605(a)(5), the House Committee Report accompanying the House Bill, which ultimately became the FSIA, states:

> It denies immunity as to claims for personal injury or death, or for damage to or loss of property caused by the tortious act or omission of a foreign state or its officials or employees, acting within the scope of their authority; *the tortious act or omission must occur within the jurisdiction of the United States. . . .*

*House Report, supra* at 6619 (emphasis added). The primary purpose of this exception is to cover the problem of traffic accidents by embassy and governmental officials in this country. *Id.* While the exception does extend generally to all noncommercial torts committed in this country, *see Letelier v. Republic of Chile*, 488 F.Supp. 665, 672 (D.D.C.1980), this Court finds that the tort, in whole, must occur in the United States. The alleged acts or omissions made the basis of this lawsuit all took place in Mexico or its territorial waters in the Bay of Campeche, and § 1605(a)(5) is, therefore, inapplicable. *See Perez v. The Bahamas*, 652 F.2d 186, 188–89 (D.C.Cir.1981).

■ Notwithstanding the fact that the tort did not occur wholly within the United States, the acts complained of were discretionary in nature, done in furtherance of Pemex' legal mandate to explore for Mexi-co's hydrocarbon deposits. Discretionary acts by a sovereign are specifically immunized from suit under the FSIA. 28 U.S.C. § 1605(a)(5)(A). The language of this exemption and its legislative history demonstrate that it parallels the discretionary act exception to the Federal Tort Claims Act, 28 U.S.C. § 2680(a). *House Report, supra* at 6620. The scope of this discretionary act exception has troubled courts for years. *See Smith v. United States*, 375 F.2d 243, 245–46 (5th Cir. 1967); *Payton v. United States*, 636 F.2d 132, 135–38 (5th Cir. 1981), *rehearing en banc granted*, 649 F.2d 385 (1981). However, the facts of this case closely resemble those of *Dalehite v. United States*, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953), still the leading case on the issue. In *Dalehite*, the Supreme Court found the government's actions in formulating and then directing the execution of a formal plan for a fertilizer export program could not form the basis of a suit under the Federal Tort Claims Act. Such actions were found to be discretionary under § 2860(a), even though an alleged abuse of that discretion resulted in the 1947 Texas City disaster.

Pemex, in this case, was executing a national plan formulated at the highest levels of the Mexican government by exploring for Mexico's natural resources. Any act performed by a subordinate of Pemex in furtherance of this exploration plan was still discretionary in nature and immune from suit under the FSIA. To deny immunity to a foreign state for the implementation of its domestic economic policies would be to completely abrogate the doctrine of foreign sovereign immunity by allowing an exception to swallow the grant of immunity preserved by § 1604. Therefore, Pemex' Motion to Dismiss all claims against it on the basis of foreign sovereign immunity must be granted.

*Permargo*

Permargo has moved to dismiss both the direct and third party actions against it, alleging that this Court lacks *in personam* jurisdiction. Extensive jurisdictional discovery has been made and an evidentiary

hearing was held on October 5, 1981. After considering the jurisdictional evidence and the arguments of counsel, this Court is convinced that it may fairly exercise personal jurisdiction over Permargo.

■■■ Personal jurisdiction is achieved by service of process under the Federal Rules of Civil Procedure. The reach of this jurisdiction is constrained by traditional notions of fair play and substantial justice embodied in the due process clause of the Fourteenth Amendment to the United States Constitution. *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). In this case, service has been attempted through various methods, however each plaintiff has served Permargo pursuant to the Texas long-arm statute, Tex.Rev.Civ.Stat.Ann. art. 2031b. (Vernon 1975 & Supp.1982), in accordance with Fed. R.Civ.P. 4(d)(7). Rule 4(d)(7) provides that a federal court may exercise jurisdiction over a nonresident defendant to the extent permitted by the law of the forum state. When a state statute is relied upon, the jurisdictional analysis is two-pronged: the defendant must be amenable to service of process under state law; and, if it is, the exercise of jurisdiction must comport with constitutional due process. *Product Promotions, Inc. v. Cousteau*, 495 F.2d 483, 489 (5th Cir. 1974); *Jetco Electronics Industries, Inc. v. Gardiner*, 473 F.2d 1228, 1232 (5th Cir. 1973).

The Texas long-arm statute provides that the Texas Secretary of State is designated agent for service of process where nonresident corporations are "doing business" within the state and the lawsuit arises from these transactions. Tex.Rev.Civ.Stat.Ann. art. 2031b (Vernon 1964); *see U-Anchor Advertising, Inc. v. Burt*, 553 S.W.2d 760 (Tex.1977); *Prejean v. Sonatrach, Inc.*, 652 F.2d 1260 (5th Cir. 1981). "Doing business," as defined by the statute, includes entering into a contract to be performed in whole or in part within the state by any party to the contract, or committing a tort, in whole or in part, within the state. Tex.Rev.Civ.Stat. Ann. art. 2031b § 4 (Vernon Supp.1982). Thus, for Permargo to be amenable to service of process, it must be found to be doing business in Texas within the meaning of the statute and these transactions must have given rise to the cause of action. *See Prejean, supra.*

■■■ Under Texas law, a corporation is said to be doing business in Texas where the tort occurs in whole or in part in the state. The pending consolidated actions represent a marine oil pollution case, which is in the nature of a maritime tort based on the commonlaw actions of negligence and nuisance. Oil slicks allegedly released by the lost IXTOC I well followed the gulf currents and impacted the Texas coast allegedly causing harm to the plaintiffs. Since Permargo was acting as the drilling contractor on the well at the time of the blowout and the cause of action arose out of its alleged negligence in that capacity, the required nexus is present and the Texas long-arm statute's requirements are satisfied.

■■ However, due process requires a further inquiry into Permargo's contacts with Texas to ensure that this contact with the forum state was not merely fortuitous. This Court must be satisfied that Permargo, by its actions, purposefully availed itself of the benefits and protection of the laws of Texas. *Hanson v. Denckla*, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958). Where a defendant engages in an activity outside Texas that would have foreseeable consequences in Texas, traditional notions of fair play and substantial justice require that the defendant reasonably anticipate being haled into Texas courts. *World-Wide Volkswagen v. Woodson*, 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). In this determination, the Fifth Circuit Court of Appeals in *Prejean v. Sonatrach, supra*, set out a three-factor analysis to determine if the required purposeful activity is present. The factors are: (1) The existence and degree of purposefulness with which the effect in that forum was created; (2) whether the defendant has other substantial contacts with the forum unrelated to the suit; and (3) the substantiality of the effect itself. *Id.* at 1269.

Generally, an allegation of negligence indicates a low degree of purposefulness, but such a situation does not preclude a finding of constitutionally permissible exercise of jurisdiction. Particularly pertinent to this lawsuit is the evidence of Permargo's contractual anticipation of and contingency planning for a possible blowout of its IXTOC I well. This fact, coupled with the foreknowledge that Gulf currents would carry any slick to the shores of Texas, indicates that damages to Texas from an offshore well disaster in Campeche Bay is a reasonably foreseeable result. Engaging in the extra-hazardous activity of drilling, notwithstanding this knowledge, implies a higher degree of purposefulness. Present, also, are many substantial contacts with Texas unrelated to this suit.

Jurisdictional discovery, while being limited to some extent,[1] has revealed a systematic business presence by Permargo in the state of Texas. Such systematic activity may subject a nonresident corporation to jurisdiction in the forum state in accordance with federal due process considerations. *Perkins v. Benguet Consolidated Mining Co.*, 342 U.S. 437, 72 S.Ct. 413, 96 L.Ed. 485 (1952). As an oil well drilling contractor, Permargo purchases the majority of its needed oil drilling equipment and spare parts from Texas suppliers, spending millions of dollars each year. For example, Permargo purchased or leased drilling rigs from Skytop Brewster and Sedco, both Texas corporations. The SEDCO 135 drilling rig, destroyed in the IXTOC I blowout, was leased in Texas from Sedco in 1978. As part of that transaction, Sedco agreed to furnish spare parts and supplies for the rig, as well as, personnel to supervise its operation.

Negotiations for such leases and purchases were conducted in Texas and delivery was made in Texas. Permargo maintains savings and checking accounts in Texas through which it makes payment to its suppliers. Moreover, Permargo has borrowed money from Texas banks to finance its business activities inside and outside Texas. Permargo maintains listings in the Houston and Galveston telephone directories and maintains an apartment in Houston for business purposes.

Much of Permargo's systematic activity in Texas is carried out through Mr. T. J. Falgout and a business entity called Golden Lane. Mr. Falgout, a resident of Galveston, Texas, owns 25 percent of the outstanding stock in Permargo; however, his status extends beyond that of a mere stockholder. He is the sole executive with Golden Lane and in this capacity engages in business solicitation and negotiations on behalf of Permargo in the state of Texas. He is authorized to withdraw funds from Permargo's account and sign checks, as well as, generally to conduct banking transactions for Permargo in Texas. Moreover, he is authorized to obligate Permargo in the purchase of oil well drilling equipment and utilizes Permargo's letterhead in his activities. In all respects, Mr. Falgout is Permargo's general agent in Texas[2] and his activities on behalf of Permargo demonstrate a conscious and long-standing business presence in Texas.

Finally, the alleged impact on Texas from the IXTOC I disaster is substantial. Crude oil from the lost well reached the lower Texas beaches entailing massive cleanup efforts and potential direct losses by businesses and individuals. Because of the extensive impact of the IXTOC I disaster, Texas has a substantial interest in providing a forum for the redress of alleged grievances suffered by Texas residents. For these reasons, the Court concludes that Permargo purposefully availed itself of the benefits and protection of Texas laws and is properly amenable to service of process under the Texas long-arm statute. Therefore, it is

---

1. *See* this Court's Memorandum and Order dated March 27, 1981, awarding Fed.R.Civ.P. 37 sanctions against Permargo and its attorneys.

2. Therefore, service upon Permargo through Mr. Falgout would be proper under Fed.R. Civ.P. 4(d)(3) subject only to the restrictions of due process, which are satisfied here. *See Jim Fox Enterprises, Inc. v. Air France*, 664 F.2d 63, 64 (5th Cir. 1981).

proper for this Court to exercise *in personam* jurisdiction over Permargo and its motion to dismiss the plaintiff's direct actions on this basis must be denied.

 Sedco has filed a third-party complaint pursuant to Fed.R.Civ.P. 14(c) seeking, *inter alia*, indemnity and contribution from Permargo for all or part of the claims filed against it. In order for this Court to exercise ancillary jurisdiction over an impleaded claim, both subject matter and personal jurisdiction must be present. *See Lonestar Package Car Co. v. Baltimore & Ohio Railroad Co.*, 212 F.2d 147 (5th Cir. 1954). This Court has subject matter jurisdiction over claims in admiralty and over suits arising under the laws of the United States. In many cases, it would be unfair to unduly burden a non-resident third-party defendant to come to a distant forum and defend based upon subject matter jurisdiction alone. Due process considerations require that personal jurisdiction also exist. Here, the Court has determined that Permargo has availed itself of the benefits and laws of this forum and that this Court may constitutionally exercise personal jurisdiction with respect to the private and public plaintiffs' direct claims against Permargo. Sedco, like the direct plaintiffs, has served Permargo pursuant to Tex.Rev.Civ.Stat. Ann. art. 2031b (Vernon 1964 & Supp.1982). Since Sedco seeks to recover over against Permargo for claims arising from the alleged maritime tort made the basis of the direct plaintiffs' claims, this Court finds that it is amenable to service of process under the Texas long-arm statute for the reasons previously discussed. Because Permargo is fairly before the Court for these direct claims, it is fair to exercise ancillary jurisdiction over Permargo as a third-party defendant. And, therefore, Permargo's Motion to Dismiss Sedco's Third-Party Complaint for Lack of *In Personam* Jurisdiction is denied.

*SEDCO*

Also pending before the Court are cross-motions seeking a determination whether the SEDCO 135 rig was a "vessel" for purposes of invoking the Limitation of Liability Act, 46 U.S.C. § 183–89. Semisubmersible drilling rigs long have been held vessels for other statutory purposes, *see e.g., Offshore Co. v. Robison*, 266 F.2d 769, 779 (5th Cir. 1959) (holding semisubmersible a vessel under the Jones Act); however, the issue of whether the same craft would be a vessel under the Limitation Act was raised but not answered in the recent case *Sohyde Drilling & Marine Co. v. Coastal States Gas Producing Co.*, 644 F.2d 1132, 1137 n.5 (5th Cir. 1981). Therefore, this Court is confronted with a question of first impression.

What constitutes a "vessel" for Limitation Act purposes has historically been given a liberal interpretation. The act itself was extended in 1886 to apply to "all seagoing vessels, and also to all vessels used on lakes or rivers or inland navigation, including canal boats, barges, and lighters." 46 U.S.C. § 188. Looking beyond this tautology, "vessel" is defined in the general statutory definitions as "every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water." 1 U.S.C. § 3. Based on this statutory framework, federal courts have generally found most watercraft, which are vessels for purposes of general maritime law, vessels within the meaning of the Limitation Act. *See In re Eastern Dredging Co.*, 138 F. 942, 944 (D.Mass.1905).

However, some crafts which have a nexus to the sea or inland waterways have been excluded from the Act's coverage. These contrivances generally have demonstrated a high degree of permanence or fixity with respect to the shore or the seabed. For example, a floating wharfboat attached to the shore and used as a floating loading dock and storage facility has been excluded from the Act's coverage. *Evansville & Bowling Green Packet Co. v. Chero Cola Bottling Co.*, 271 U.S. 19, 46 S.Ct. 379, 70 L.Ed. 805 (1926). Similarly, a floating drydock has not been considered a vessel because its purpose and actual use was not in navigation as a means of transportation. *Berton v. Tietjen & Lang Dry Dock Co.*, 219

F. 763, 774 (D.N.J.1915); *cf. Cope v. Vallette Dry Dock Co.*, 119 U.S. 625, 7 S.Ct. 336, 30 L.Ed. 501 (1887) (holding a floating dry dock not a vessel subject to salvage service).

Structures which are nothing more than artificial islands permanently affixed to the seabed have also been held not to be vessels under the Limitation Act. In *In re United States Air Force Texas Tower No. 4*, 203 F.Supp. 215 (S.D.N.Y.1962), the court looked both at the lack of purpose for use in navigation as transportation and the permanence of affixation to the seabed in holding an offshore radar platform not a vessel for limitation purposes. Additionally, the court determined that the Texas Tower was not a structure used to carry freight and that it was not subject to the perils of the sea in a navigational sense; *Id.* at 219.

Advancing technology has played havoc with the Limitation Act; however, a broad view of what is a vessel remains. Particularly troublesome are crafts that float and are used in marine navigation, but are anchored in order to perform the function for which they were designed. Generally, this problem has arisen when a traditionally maritime vessel, a barge, is fitted with permanent structures and cargo for a specific purpose. In *In re P. Sanford Ross, Inc.*, 196 F. 921 (E.D.N.Y.1912), rev'd on other grounds, 204 F. 248 (2nd Cir. 1913), the district court held a barge fitted with a pile driver to be a vessel for limitation purposes. The district court found that mooring the barge securely prior to driving piles did not alter the status of the craft, which was otherwise employed in navigation and considered a vessel under the Limitation Act. *Id.* at 925. Similarly, the Second Circuit Court of Appeals has held an anchored scow equipped with a loading derrick to be a vessel for purposes of the Act. *The Sunbeam*, 195 F. 468 (2nd Cir. 1912); *accord Patton-Tully Transportation Co. v. Turner*, 269 F. 334 (6th Cir. 1920). In *Eastern S. S. Corp. v. Great Lakes Dredge & Dock Co.*, 256 F. 497 (1st Cir. 1919), a drilling boat, which was firmly held to the bottom of the waterway by metal "spuds" while drilling, was also found to be a vessel under the Act.

Thus, as the law has evolved, several factors have emerged as indicia of whether a craft is a vessel under the Act. First, the craft must be built with the intent that it be used in navigation as a means of transportation. Second, the contrivance must not be permanently attached to the shore or seabed. Finally, the craft must be subject to the perils of the sea. Comparing these factors to the craft in question, the Court finds the SEDCO 135 semisubmersible rig to be a vessel under the Limitation Act.

The SEDCO 135 was built in 1965 at the Ingalls Shipyard in Mississippi and between that time and 1979, when she was scuttled, she made two trans-atlantic voyages and eleven long ocean voyages, logging a total of 15,947 miles in navigation. These journeys took her to the waters off Portugal, then to the coast of Africa and eventually to the Bay of Campeche. During these voyages, the SEDCO 135 was subject to all perils of the sea and without question would have been considered a vessel under the Limitation Act had an accident occurred during her travels. Additionally, she was designed to transport cargo, albeit a permanent one, throughout her voyages.

The SEDCO 135 was registered as a United States vessel engaged in foreign commerce pursuant to federal law. She was inspected by the U. S. Coast Guard and surveyed on an annual basis by the American Bureau of Shipping. Moreover, she was subject to a preferred ship mortgage. Clearly, she was built and utilized as an ocean-going vessel in navigation as a means of transporting a fixed cargo. During her voyages and while she was anchored at the various drill sites, she was subject to the perils of the sea suffered by any blue-water vessel.

While structures built to be permanently affixed to the sea bottom are uniformly held not vessels for admiralty purposes, *see Rodrigue v. Aetna Casualty and Surety Co.*, 395 U.S. 352, 89 S.Ct. 1835, 23

L.Ed.2d 360 (1969), the SEDCO 135 was built to be mobile. Whenever the rig was towed to a new drill site, she was held by nine Danforth anchors. The only other contact with the seabed was the "drill string" through which the actual drilling was done. This Court concludes that anchoring in place what is otherwise a vessel does not change a craft's status under the Limitation Act. The original purpose of the Limitation Act was to promote the building of vessels, to encourage the business of navigation, and thus put the United States on the same footing as other seafaring countries. *Chero Cola Bottling Co., supra* 271 U.S. at 21, 46 S.Ct. at 380. Commentators have criticized the Act in light of today's technology and economic realities, *see e.g.,* G. Gilmore & C. Black, *The Law of Admiralty,* 821–22 (2d ed. 1975); however, it remains on the books. The act has traditionally been applied to benefit a broad class of vessel owners. Whether the Act retains vitality within the sphere in which it has traditionally applied is a matter for Congress, not the Courts, to decide. *University of Texas Medical Branch at Galveston v. United States,* 557 F.2d 438, 454 (5th Cir. 1977). For the foregoing reasons, this Court finds that consistent with other statutory schemes, a semisubmersible drilling rig is a vessel for purposes of the Limitation of Liability Act and Sedco may invoke the provisions of that act with respect to the claims brought against the SEDCO 135 rig. Whether Sedco will prevail in the limitation proceeding is a question left for another day.

## Conclusion

These consolidated actions arise out of history's worst offshore drilling disaster and have presented this Court with several difficult jurisdictional issues. Private and public American plaintiffs have sued two Mexican entities—the national oil company of Mexico, Pemex, and a privately owned Mexican corporation, Permargo. Because they have chosen to sue these foreign defendants in the Southern District of Texas, two legal issues with international ramifications are raised. First, Pemex, as an instrumentality of the Mexican government, seeks dismissal from this suit based on the long-standing doctrine of foreign sovereign immunity, recently codified in the Foreign Sovereign Immunity Act of 1976. Finding the actions of Pemex in connection with the IXTOC I well blowout both noncommercial and within the discretionary activity protected by the FSIA, this Court grants Pemex's Motion to Dismiss.

Second, Permargo, a Mexican drilling company which was contracted by Pemex to drill the IXTOC I well, moves the Court for dismissal based on a lack of personal jurisdiction. This Court finds that Permargo is amenable to service of process in accordance with the Texas long-arm statute and that exercising jurisdiction over Permargo comports with traditional notions of fair play and substantial justice guaranteed by the United States Constitution. Therefore, Permargo's Motion to Dismiss is denied.

Sedco, by filing an action to limit its liability, has invoked this Court's admiralty jurisdiction. The Limitation of Liability Act provides that an owner of a vessel may limit its liability to the value of the vessel after the occurrence in question. Sedco, as the owner of the SEDCO 135, seeks to interpose this proceeding against the array of claimants in this case. Several Plaintiffs have filed motions to dismiss Sedco's limitation action, alleging that the semisubmersible rig in question was not a "vessel" for purposes of the Limitation Act. This Court finds that semisubmersible rigs are considered vessels for other admiralty purposes and that the Limitation Act historically has been applied to a broad class of crafts. Because the SEDCO 135 rig was constructed to be and was, in fact, utilized as an ocean-going watercraft, this Court denies Plaintiffs' Motions to Dismiss and grants Sedco's Motion for Summary Judgment. This finding that the SEDCO 135 was a vessel only allows Sedco to invoke the limitation proceeding; this Court makes no finding at this time whether Sedco may ultimately prevail in such a proceeding. Finally, the Court reserves until a later time the question whether the Limitation Act

may be asserted with respect to the statutory causes of action alleged by the United States and the State of Texas. It is therefore

ORDERED, ADJUDGED and DECREED that:

1. Permargo's Motion to Dismiss for Lack of In Personam Jurisdiction be DENIED;

2. Pemex's Motion to Dismiss based on Foreign Sovereign Immunity be GRANTED and all claims against Pemex in this consolidated action be DISMISSED with prejudice;

3. Sedco's Motion for Partial Summary Judgment declaring the SEDCO 135 a vessel be GRANTED;

4. The Giles, et al Plaintiffs' Motion to Dismiss Sedco's Limitation Action for Lack of Subject Matter Jurisdiction[3] be DENIED;

5. The State of Texas' Motion for Partial Summary Judgment with respect to the vessel issue be DENIED; and

6. The Willacy County Plaintiffs' Motion to Dismiss Sedco's Limitation Action for Lack of Subject Matter Jurisdiction be DENIED.

---

3. This Motion was joined in by the Haylock Plaintiffs.