**Gregory Allen PERSINGER, et al., Appellants**

v.

**ISLAMIC REPUBLIC OF IRAN, et al.**

No. 81–2003.

United States Court of Appeals, District of Columbia Circuit.

Argued May 19, 1983.

Decided March 13, 1984.

Michael F. Hertz, Dept. of Justice, Washington, D.C., with whom J. Paul McGrath, Asst. Atty. Gen., Stanley S. Harris, U.S. Atty. (at the time the brief was filed), Robert E. Kopp, Atty., Dept. of Justice, and Jonathan B. Schwartz, Atty. Dept. of State, Washington, D.C., were on the brief for appellee, U.S. Theodore C. Hirt, Atty. Dept. of Justice, Washington, D.C., also entered an appearance for U.S.

Brice M. Clagett, Washington, D.C., with whom Paul G. Gaston and Harold Hongju Koh, Washington, D.C., were on the brief for amicus curiae, FLAG, Inc., opposing modification of original opinion.

Peter J. Neeson, Philadelphia, Pa., of the Bar of the Supreme Court of Pa., pro hac vice, by special leave of the Court, with whom Mark H. Tuohey, III, Washington, D.C., Julian N. Eule, Philadelphia, Pa., were on the brief, for appellants.

Thomas G. Shack, Jr. and Thomas D. Silverstein, Washington, D.C., entered appearances for appellee, Islamic Republic of Iran.

Before EDWARDS and BORK, Circuit Judges, and BAZELON, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge BORK.

Opinion dissenting in part and concurring in part filed by Circuit Judge HARRY T. EDWARDS.

BORK, Circuit Judge:

This is an action for damages against the Islamic Republic of Iran for injuries inflicted by the seizure and detention of American hostages. Appellants, plaintiffs below, are a former hostage and his parents. On October 8, 1982, we issued an opinion af-

firming the district court's dismissal of appellants' claims. There, we held the defense of sovereign immunity inapplicable but decided that appellants had failed to state a claim upon which relief could be granted. Specifically, we held that the executive order signed by President Carter, pursuant to an agreement with Iran to secure the release of the hostages, lawfully and effectively extinguished appellants' claims against Iran.

Though the United States, which had intervened as a party-defendant in order to meet its obligations under the executive agreement with Iran, see *American International Group, Inc. v. Islamic Republic of Iran*, 657 F.2d 430, 433 (D.C.Cir.1981), prevailed, the government was sufficiently concerned about our ruling on the question of sovereign immunity to petition the panel for rehearing on that issue. We granted the petition, and now affirm the judgment of the district court on that court's alternate ground: Iran enjoys sovereign immunity and that immunity has not been lifted for the acts involved here by the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1330, 1602 *et seq.* (1976) ("FSIA" or "Act"). This conclusion also requires that we vacate our prior opinion.

## I.

Gregory Allen Persinger is a United States Marine, who, on November 4, 1979, was stationed at the United States Embassy in Tehran, Iran. On that date, the Embassy was seized by Iranian militants, and the Embassy's personnel, including Sergeant Persinger, were captured and held hostage. This act, which was not merely hostile to the United States but unprecedented in the history of international rela-

tions, at once created a crisis between the United States and Iran. The United States tried to secure the release of the hostages through a series of stringent retaliatory measures, but all such efforts failed.[1]

Ultimately, the United States was able to obtain the hostages' freedom only by an executive agreement with Iran that necessarily made concessions to that country. Since diplomatic relations with Iran had been severed, the agreement was embodied in two Declarations of the Government of Algeria, initialed for the United States by Deputy Secretary of State Warren M. Christopher on January 19, 1981. The hostages, including Sergeant Persinger, were released the following day, having been held captive for almost fifteen months.[2]

Sergeant Persinger and his parents brought suit in the district court against the Islamic Republic of Iran on February 2, 1981, alleging numerous violations of treaties and of international, constitutional, and common law. The United States moved to dismiss the complaint. After a hearing, District Judge Oberdorfer granted the government's motion. *Persinger v. Islamic Republic of Iran*, Civ. No. 81–00230 (D.D.C. Aug. 21, 1981). Relying on *Dames & Moore v. Regan*, 453 U.S. 654, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981), the district court held that "the President may dispose of private claims against foreign states to resolve, or avoid, international crises." *Persinger v. Islamic Republic of Iran*, slip op. at 2. (In *Dames & Moore*, the Supreme Court upheld the legality of a different executive order issued as part of the effort to carry out the Algerian Declaration.) The district court held, in the alternative, that even in the absence of a valid executive order, Iran would be immune under the Foreign Sovereign Immunities Act from

---

**1.** The President declared a national emergency and issued an executive order blocking Iran's threatened removal or transfer of all Iranian assets in this country. The United States and other nations imposed trade sanctions upon Iran. The United States took its case to the International Court of Justice at the Hague, which declared Iran's actions to be in violation of international law. Case Concerning United States Diplomatic and Consular Staff in Tehran (United States v. Iran), 1980 I.C.J. 200, *reprinted*

*in* 19 I.L.M. 553 (1980). Finally, the United States attempted a military rescue operation that cost several American lives.

**2.** The executive agreement purported to extinguish all hostage claims against Iran but the effectiveness of that extinguishment need not be decided since Iran, in any event, is immune from this tort action.

suit for tortious acts in the United States Embassy in Tehran. This appeal followed.[3]

## II.

### A.

■ In its initial submissions, the government contended that we need not reach the issue of Iran's sovereign immunity—and of this court's jurisdiction—if we decide that President Carter had the power lawfully to extinguish the Persingers' claims. Brief for the United States at 22. We disagree. The Act expressly deprives a court of jurisdiction over any party entitled to sovereign immunity. 28 U.S.C. § 1604 (1976) ("[A] foreign state shall be immune *from the jurisdiction of the courts* of the United States . . . .") (emphasis added); *see Texas Trading & Milling Corp. v. Federal Republic of Nigeria*, 647 F.2d 300, 306–07 (2d Cir.1981), *cert. denied*, 454 U.S. 1148, 102 S.Ct. 1012, 71 L.Ed.2d 301 (1982); *cf. Tuck v. Pan American Health Organization*, 668 F.2d 547, 549 (D.C.Cir.1981) (immunity issue must be addressed before merits). Since we decide that in this case Iran is not subject to this court's jurisdiction, it would be improper for us to reach the question of the President's authority over these claims.[4] To exceed the jurisdictional limits of a court's power is to exercise authority illegitimately, *Insurance Corp. of Ireland, Ltd. v. Campagnie des Bauxites de Guinee*, 456 U.S. 694, 702, 102 S.Ct. 2099, 2104, 72 L.Ed.2d 492 (1982). For that reason we decide jurisdiction first, and our conclusion that jurisdiction is absent means that we cannot let our prior opinion on the merits stand.

■ Foreign states are generally immune from the jurisdiction of federal and state courts. 28 U.S.C. § 1604. *See The Schooner Exchange v. McFaddon*, 11 U.S. (7 Cranch) 116, 136, 3 L.Ed. 287 (1812). The FSIA, however, creates a number of exceptions to this immunity. 28 U.S.C. § 1605. One exception provides that:

(a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—

. . . .

(5) . . . in which money damages are sought against a foreign state for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment; . . . .

28 U.S.C. § 1605(a)(5). The "United States" is defined to include "all territory and waters, *continental or insular*, subject to the jurisdiction of the United States." 28 U.S.C. § 1603(c) (emphasis added). Thus, if a foreign state's "act[s] or omission[s]" cause tortious injury within the United States, as defined in section 1603(c), the foreign state's immunity is abrogated, subject to the exceptions set out in section 1605(a)(5), and there can be both

---

**3.** In *Williams v. Iran*, 692 F.2d 151 (D.C.Cir. 1982), and *Lauterbach v. Iran*, 692 F.2d 150 (D.C.Cir.1982), this Court affirmed lower court judgments dismissing plaintiffs' claims against Iran "for the reasons stated in *Persinger v. Islamic Republic of Iran*, No. 81–2003, decided by this Court on October 8, 1982." *See also Moeller v. Islamic Republic of Iran*, No. 80–1171 (D.D.C. Aug. 5, 1981) (no appeal taken). Between the date on which we heard oral argument on this petition, and today the Ninth Circuit considered the same issue that is before us, *McKeel v. Islamic Republic of Iran*, 722 F.2d 582 (9th Cir. 1983), and concluded, as we do, that sovereign immunity bars appellants' suits from going forward. *Id.* at 589. We refer to that opinion where appropriate.

Currently, two cases against the United States by former hostages seeking compensation for extinguishment of their claims against Iran are pending in the United States Claims Court. *Cooke v. United States*, 1 Cl.Ct. 695 (1983); *Amburn-Lijek v. United States*, No. 564–82C (Ct.Cl.). The Claims Court has stayed its consideration of the merits of the hostages' claims in both *Cooke* and *Amburn-Lijek* pending the disposition of the rehearing in this case. *Cooke v. United States*, 1 Cl.Ct. 695 (1983) (denying motion for class certification).

**4.** That precept is embodied in Fed.R.Civ.P. 12(h)(3): "Whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action."

subject matter and personal jurisdiction in United States courts. 28 U.S.C. § 1330(a), (b).

 That Congress has the power to exercise jurisdiction over certain activities at U.S. embassies abroad is not disputed. *Agee v. Muskie*, 629 F.2d 80, 111 (D.C.Cir.) (MacKinnon, J., dissenting) (United States embassy is under concurrent jurisdiction of United States criminal laws), *rev'd on other grounds sub nom. Haig v. Agee*, 453 U.S. 280, 101 S.Ct. 2766, 69 L.Ed.2d 640 (1980); *see also* Brief for the United States at 22–23.[5] The issue before this court, then, is whether Congress, in enacting the FSIA, intended to exercise its jurisdiction to give courts in this country competence to hear suits against foreign states for torts committed on United States embassy premises abroad. That issue turns upon the question whether United States embassies are within the definition of "United States" set forth in section 1603(c). The government contends that the FSIA was intended to abrogate sovereign immunity only for torts within the exclusive territorial jurisdiction of the United States.[6] It is contended, on the other side, that since embassies are "substantially removed from the jurisdiction of the receiving state," Brief of *Amicus Curiae* FLAG, Inc. on Rehearing at 7,[7] and are subject to the concurrent jurisdiction of both sending and receiving states, Iran is not shielded by sovereign immunity from liability for torts at the United States Embassy in Tehran, Iran. *Id.* We are persuaded by the language of the statute, its legislative history, and by the consequences of adopting a contrary position that section 1605(a)(5) does not remove Iran's immunity here.

In section 1603(c), Congress used the words "continental or insular" to modify the scope of the phrase "all territory and waters ... subject to the jurisdiction of the United States." The latter phrase, if it stood alone, might lead to the conclusion that any territory over which the United States exercises any form of jurisdiction constitutes the "United States" for purposes of the FSIA. Since the United States has some jurisdiction over its Embassy in Iran, it would then follow that Iran had no immunity for tortious acts committed on the Embassy grounds. We think, however, that the modifying words make this construction too awkward to be countenanced. If the definition meant all territory subject to any form of United States jurisdiction, the words "continental or insular" would be surplusage: all territory is continental or insular. The modifying phrase is rather clearly intended to restrict the definition of the United States to the continental United States and such islands as are part of the United States or are its possessions. The ground upon which our Embassy stands in Tehran does not fall within that definition. Hence, Congress intended that, under the statute, Iran should retain its sovereign immunity in this case.

Though the legislative history of the FSIA does not address directly the meaning of "territory ... subject to the jurisdiction of the United States," *see, e.g.,* H.R. Rep. No. 1487, 94th Cong., 2d Sess. 16 (1976) ("House Report"); S.Rep. No. 1310,

5. The government maintains that subjecting a foreign state to jurisdiction for acts on United States embassy premises abroad "might well create a serious danger of conflict with the Fifth Amendment due process clause." Brief for the United States on Rehearing at 10. Since we hold that Congress did not intend to exercise jurisdiction in a case such as this one, we need not reach the question of Congress' constitutional power to exercise such jurisdiction.

6. This is the conclusion that, except for this Court's initial determination, every other court which considered the question has reached. *See McKeel v. Iran*, 722 F.2d 582 (9th Cir.1983); *Persinger v. Iran*, No. 81–00230 (D.D.C. Aug. 21,

1981); *Moeller v. Iran*, No. 80–1171 (D.D.C. Aug. 5, 1981); *Lauterbach v. Iran*, No. 81–0350 (D.D.C. June 11, 1981); *Williams v. Iran*, No. 79–3295 (D.D.C.1981).

7. Sergeant Persinger and his parents, plaintiffs below, have, in this rehearing, substantially deferred to counsel for FLAG, Inc. They have stated to this court that "with regard to the issues presently pending before this Court, the interests of the appellants and FLAG are identical." Brief for Appellants on Rehearing at vii, 1. Accordingly, we cite to FLAG's briefs as if they were appellants' own.

94th Cong., 2d Sess. 15 (1976), U.S.Code Cong. & Admin.News 1976, pp. 6604, 6614, the focus of Congress' concern strongly suggests that the conclusion we have drawn from the statute's language is correct. Congress' principal concern was with torts committed in this country. The House Report makes clear that "Section 1605(a)(5) is *directed primarily at the problem of traffic accidents* but is cast in general terms as applying to all tort actions for money damages ...." House Report at 20–21, U.S.Code Cong. & Admin. News, 1976 p. 6619 (emphasis added). Similarly, many of those testifying about the purpose and effect of the FSIA stressed the territorial limitation of the Act. *See, e.g., Jurisdiction of U.S. Courts in Suits Against Foreign States: Hearings on H.R. 11315 Before the Subcomm. on Administrative Law and Governmental Relations of the House Comm. on the Judiciary,* 94th Cong., 2d Sess. 27 (1976) (testimony of State Department Legal Advisor Monroe Leigh that proposed section 1605(a)(5) "would govern automobile accident cases and other tort actions. It would deny the defense of sovereign immunity with respect to many torts that *occur in the United States* " (emphasis added)); *id.* at 58 (testimony of Peter D. Trooboff) (FSIA eliminates immunity, for example, for "the negligent operation of a motor vehicle ... in the District of Columbia"); *id.* at 95 (testimony of Michael M. Cohen) (section 1605(a)(5) "removes the defense [of immunity] for most tort suits arising here").

Moreover, at the 1973 hearings to the predecessor bill—which, although not passed, was "essentially the same ... except for [some] technical improvements," [8] House Report at 10, U.S.Code Cong. & Admin.News 1976, p. 6608,—one of the Act's principal draftsmen, Bruno Ristau, testified that:

> We would like, based on our experience as a litigant abroad to subsume to the jurisdiction of our domestic courts foreign governments and foreign entities who engage in certain activities *on our territory* to the same extent that the U.S. Government is already at the present time subject to the jurisdiction of foreign courts, when it engages in certain activities *on their soil.*
>
> ....
>
> [W]e would like to afford *our local citizens* and entities who deal with foreign governments *in the United States* effective redress through the instrumentality of our courts. If a dispute arises as a result of an activity which a government carries on *in this country*, the most appropriate place to resolve such a dispute would be through the courts ....

*Immunities of Foreign States: Hearings on H.R. 3493 Before the Subcomm. on Claims and Governmental Relations of the House Comm. on the Judiciary,* 93d Cong., 1st Sess. 29 (1973) (testimony of Bruno Ristau) (emphasis added).

In enacting the FSIA, Congress intended to "bring U.S. practice into conformity with that of most other nations." House Report at 12, U.S.Code Cong. & Admin.News 1976, p. 6610. Our reading of the "United States," as modified by the terms "continental or insular," is, therefore, reinforced by the fact that codifications by other nation-states and international organizations—with which Congress sought to be consistent—have provided that a state loses its sovereign immunity for tortious acts only where they occur in the territory of the forum state. Brief for the United States on Rehearing at 15–16, and statutes cited therein.[9]

---

**8.** Although the predecessor to the Act did not contain a definition of the "United States," there is no indication in the legislative history of the 1976 Act that the addition of section 1603(c) defining the jurisdiction of the United States was intended to expand the scope of the statute's exceptions.

**9.** Appellants contend that the Vienna Convention on Diplomatic Relations, by endorsing the rule of inviolability, and by substantially removing a foreign embassy from the jurisdiction of the receiving state, establishes that the United States exercises concurrent jurisdiction over embassy premises. Brief of *Amicus Curiae* FLAG, Inc. on Rehearing at 21–23. Inviolability, by

Another reason for finding that sovereign immunity exists here is the series of unhappy consequences that would follow if we read section 1603(c) broadly to cover areas in which the United States had jurisdiction of any sort. These consequences would entail not only serious inconvenience and injustice but also embarrassment to our foreign relations. We offer these considerations not as policies we choose but as throwing light on congressional intent. If Congress had meant to remove sovereign immunity for governments acting on their own territory, with all of the potential for international discord and for foreign government retaliation that that involves, it is hardly likely that Congress would have ignored those topics and discussed instead automobile accidents in this country.

One such consequence is that a decision abrogating sovereign immunity for torts on embassy premises would, as the government points out, be the "functional equivalent" of making U.S. embassies part of U.S. territory "for jurisdictional purposes." Brief for the United States on Rehearing at 28. Such a result could, for example, cause the French government to be subject to suit in the United States if a French government vehicle were involved in an automobile accident on the U.S. embassy grounds in West Germany. *Id.* at 29. Furthermore, foreign states "might hesitate in providing services to U.S. embassies or consulates" were they to be subject to suit in U.S. courts for negligent acts or omissions on those premises. *Id.*[10] In addition, since

some foreign states base their sovereign immunity decisions on reciprocity, or parity of reasoning, it is possible that a decision to exercise jurisdiction in this case would subject the United States to suits abroad for torts committed on the premises of embassies located here. 6 M. Whiteman, *Digest of International Law* 580–82 (1968).

A principle revoking sovereign immunity on our embassy grounds abroad would also, presumably, have the same effect as to our military and naval bases around the world, since the United States exercises jurisdiction in such locations. The possibilities are almost endless for tort suits in this country against foreign governments for acts or omissions all over the world. We are persuaded that Congress intended nothing of the sort. Embassies may be, as appellants argue, unique in their inviolability but that does not distinguish them from military facilities, libraries, AID missions, and the like with respect to the criteria of the statute. If the controlling question were only whether the United States had some jurisdiction, all premises controlled by this country anywhere in the world would fit the statutory definition of the "United States." Fidelity to the statutory language would prevent us from picking and choosing among premises subject to some extent of congressional control.

Appellants rely heavily on two criminal cases, *United States v. Pizzarusso*, 388 F.2d 8 (2d Cir.), *cert. denied*, 392 U.S. 936, 88 S.Ct. 2306, 20 L.Ed.2d 1395 (1968), and

itself, however, does not equal extraterritoriality. Moreover, the thrust of our holding here is that Congress, in enacting the FSIA, did not intend to exercise whatever power it may have over a foreign sovereign's tortious acts committed at U.S. embassy premises abroad.

**10.** Appellants argue that the "discretionary function" exception to tort liability would shield foreign governments from liability in the examples posited by the government. Brief of *Amicus Curiae* FLAG, Inc. on Rehearing at 42–44. This is not so. One of the express purposes of the Federal Tort Claims Act, 28 U.S.C. §§ 1346, 2671 *et seq.* (1976)—the act where the discretionary function was first set forth—is to permit suits for torts arising out of automobile accidents with U.S. government vehicles. *Dalehite*

*v. United States*, 346 U.S. 15, 28, 73 S.Ct. 956, 964, 97 L.Ed. 1427 (1953). Moreover, the "discretionary function" exception has not shielded the United States from liability for torts committed while providing fire and police services—the very "services" the government argues that foreign states might hesitate to provide were we to limit their immunity for torts on embassy premises. *See, e.g.,* Rayonier Inc. v. United States, 352 U.S. 315, 317–19, 77 S.Ct. 374, 375–76, 1 L.Ed.2d 354 (1957) (United States could be held accountable for the negligence of its firefighters); *Downs v. United States*, 522 F.2d 990, 997 (6th Cir.1975) (United States could be liable for FBI agent's negligence in attempt to stop a hijacking).

*United States v. Erdos*, 474 F.2d 157 (4th Cir.), *cert. denied*, 414 U.S. 876, 94 S.Ct. 42, 38 L.Ed.2d 122 (1973), to support their contention that the United States "may assert jurisdiction over activities occurring on the premises of United States embassies abroad." Brief of *Amicus Curiae* FLAG, Inc. on Rehearing at 14. In *Pizzarusso*, the Second Circuit held that Congress had the power to give federal courts jurisdiction over a visa applicant who, in an attempt to gain entry into the United States, perjured herself at the American Consulate in Canada. And in *Erdos*, the Fourth Circuit held that Congress had exercised its power to proscribe the killing of an American citizen by another American citizen within a foreign diplomatic compound. These cases are inapposite. *McKeel v. Islamic Republic of Iran*, 722 F.2d 582, 588–89 & n. 9 (9th Cir.1983). Neither involved the exercise of jurisdiction over a foreign sovereign. The question here, as in *Erdos*, is not the raw power of Congress to provide jurisdiction; rather, the problem is one of intention, *i.e.*, statutory construction. *Erdos*, 474 F.2d at 159. We do not think that Congress intended to abrogate the immunity generally enjoyed by a foreign sovereign for tortious acts at embassies within its own territory.[11]

### B.

The claims brought by Sergeant Persinger's parents present a variation on the issue just discussed. They seek to recover for mental and emotional distress suffered within the continental United States. Such injuries are said to be actionable because section 1605(a)(5) requires only that the injury be suffered in the United States but does not require that the tortious act or omission occur here.

Section 1605(a)(5) is ambiguous on this point. It states that immunity is removed in actions "for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission" of a foreign state. It is thus unclear whether both the tort and the injury must occur here or whether the tort may occur abroad and be actionable so long as the injury is suffered here. *Compare Frolova v. Union of Soviet Socialist Republics*, 558 F.Supp. 358, 362 (N.D.Ill.1983) (act or omission must occur in the United States), and *In re Sedco, Inc.*, 543 F.Supp. 561, 567 (S.D.Tex. 1982), *with Letelier v. Republic of Chile*, 488 F.Supp. 665, 674 (D.D.C.1980) (only tortious injury need occur in the United States). *See generally, McKeel v. Islamic Republic of Iran*, 722 F.2d at 589–90 n. 10. The ambiguity goes no deeper than the surface of the text, however, for the briefest consideration of the purposes of the statute shows that the first alternative must be chosen: both the tort and the injury must occur in the United States.

We have shown that the proper construction of the statute deprives the district court of jurisdiction to entertain Sergeant Persinger's claim. Iran is immune from tort suits here for actions taken by it on its own territory. It would be anomalous to say that Congress intended to deny a remedy to him—a hostage imprisoned and physically abused for more than a year—and yet

---

**11.** In addition, jurisdiction in each of these cases was based on a statute defining jurisdiction for the purpose of the title dealing with federal crimes only—18 U.S.C. § 7 (1982), which covers the "special maritime and territorial jurisdiction of the United States"—as well as on different theories of jurisdiction. The *Pizzarusso* court expressly invoked the "protective" theory of jurisdiction, that "a state 'has jurisdiction to prescribe a rule of law attaching legal consequences to conduct outside its territory that threatens its security as a state or the operation of its governmental functions, provided the conduct is generally recognized as a crime under the law of states that have reasonably devel-

oped legal systems.'" *Restatement (Second) of Foreign Relations Law of the United States* § 33 (1965), *quoted in Pizzarusso*, 388 F.2d at 10. Although the Fourth Circuit in *Erdos* did not explicitly label the head of jurisdiction that Congress had exercised to proscribe the conduct in that case, the result can be read as based on the "nationality" principle—the exercise of jurisdiction over U.S. nationals. But *Erdos* is inapposite primarily for the reason set forth above— that Congress did not intend the FSIA to apply to the case before us, whereas Congress did intend the "special maritime and territorial jurisdiction of the United States" to cover the case before the *Erdos* court.

also intended to expose Iran to a suit by his parents for their emotional distress. Indeed, appellants' argument would have the result that had one hostage died in Tehran and another been released and died in the United States, both deaths being due to injuries inflicted while they were held hostage, the district court would have jurisdiction over the second suit but not over the first. Such results would deprive the statute of any policy coherence.

Our reading of the statute is further supported by the following passage in the House Report:

> It [section 1605(a)(5) ] denies immunity as to claims for personal injury or death, or for damage to or loss of property, caused by the tortious act or omission of a foreign state or its officials or employees, acting within the scope of their authority; *the tortious act or omission must occur within the jurisdiction of the United States* ....

House Report at 21, U.S.Code Cong. & Admin.News 1976, p. 6619, (emphasis added).

 Moreover, a comparison of the noncommercial tort exception—section 1605(a)(5), under which this suit was brought—with the commercial activity exception, section 1605(a)(2), demonstrates that Congress intended the former to be narrower than the latter. The commercial activity exception expressly provides that a foreign sovereign's commercial activities "outside the territory of the United States" having a "direct effect" inside the United States may vitiate the sovereign's immunity. Any mention of "direct effect[s]" is noticeably lacking from the noncommercial tort exception. When Congress uses explicit language in one part of a statute to cover a particular situation and then uses different language in another part of the same statute, a strong inference arises that the two provisions do not mean the same thing. *See Russello v. United States,* ── U.S. ──, 104 S.Ct. 296, 300, 78 L.Ed.2d 17 (1983); *United States v. Martino,* 681 F.2d 952, 954 (5th Cir.1982) (en banc), *quoting United States v. Wong Kim Bo,* 472 F.2d 720, 722 (5th Cir.1972). Section 1605(a)(5) does not contain the "direct effect[s]" language of section 1605(a)(2), and therefore does not support jurisdiction over the parents' tort claims.[12]

For the reasons stated, we have concluded that the FSIA shields Iran from liability and this court has no jurisdiction over the claims of appellants Jacqueline and Lawrence Persinger, and their son, Sergeant Gregory Persinger. Our prior opinion is therefore vacated, and the judgment of the district court is

*Affirmed.*

HARRY T. EDWARDS, Circuit Judge, dissenting in part and concurring in part:

I concur in the result in Part II.A, but I dissent from the rationale and holding of Part II.B.

Part II.B holds that 28 U.S.C. § 1605(a)(5) (1976) does not apply to Persinger's parents' claim for damages against Iran for mental and emotional distress suffered within the United States and caused by the seizure and detention of their son in Iran. Section 1605(a)(5) provides, in pertinent part, that a foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case

> in which money damages are sought against a foreign state for personal inju-

---

12. Appellants also claim that the attack on the embassy was an "international crime" over which "every nation has jurisdiction to prescribe and enforce." Brief of *Amicus Curiae* FLAG, Inc. on Rehearing at 56. In addition, the United States could invoke the "protective principle" to exercise jurisdiction over Iran in this case. *Id.* at 57. There can be no doubt that Iran's actions were international crimes. *See* Case Concerning United States Diplomatic and Consular Staff in Tehran (*United States v. Iran* ), 1980 I.C.J. 200, *reprinted in* 19 I.L.M. 553 (1980). The heinousness of Iran's actions, however, is not sufficient to give this court jurisdiction to hear the plaintiffs' claims. Neither the substantive basis of the tort, nor the seriousness of the crime, is relevant to the question of jurisdiction. The FSIA, as the expression of Congress, applies to deprive us of jurisdiction.

ry or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment ....

I find the language of this provision unambiguous and clearly applicable on its face to the parents' claim. In particular, the statute plainly requires that *only the injury,* and not the tortious act or omission, occur in the United States. I see no reason to resort to the legislative history to clarify the plain language of the statute. Congress never enacted the language of the House Report that "the tortious act or omission must occur within the jurisdiction of the United States." H.R.REP. No. 1487, 94th Cong., 2d Sess. 21, U.S.Code Cong. & Admin.News 1976, p. 6619 (1976).

Moreover, I do not find that the case law persuasively supports the reading of the statute adopted in the majority opinion. Only one case, *In re Sedco, Inc.,* 543 F.Supp. 561, 567 (S.D.Tex.1982), holds that the tortious act or omission must occur in the United States. The *Sedco* court reached its conclusion primarily on the basis of the language of the House Report. A second case cited in the majority opinion, *Frolova v. Union of Soviet Socialist Republics,* 558 F.Supp. 358, 362 (N.D.Ill.1983), merely states, without any analysis, that the tortious act or omission must occur in the United States. That statement is *pure dictum* because the court expressly declined to decide the Foreign Sovereign Immunities Act issue.

I am also not convinced that it is anomalous to allow Persinger's parents to recover damages for mental and emotional injuries suffered by virtue of their son's confinement, but not to allow Persinger himself to recover damages for his own confinement. As a policy matter, Congress might easily have determined to give American courts jurisdiction over claims for damages caused by tortious acts or omissions occurring outside the United States only to the extent that those acts or omissions produce effects within the United States.

Finally, I am not convinced that the "direct effect" language of section 1605(a)(2) compels the reading of section 1605(a)(5) adopted in the majority opinion. There is nothing in the legislative history to support this view and one might as easily assume that Congress intended to restrict jurisdiction more in cases involving commercial activity not carried on in the United States than in cases involving noncommercial torts.

My main point of dissent is that the clear terms of the statute allow for the parents' claim. I do not think that we are at liberty to decide otherwise on "policy grounds."