# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued October 16, 2017      Decided December 1, 2017

No. 17-7023

DAVID SCHERMERHORN, ET AL.,
APPELLANTS

v.

STATE OF ISRAEL, ET AL.,
APPELLEES

---

Appeal from the United States District Court
for the District of Columbia
(No. 1:16-cv-00049)

---

*Steven M. Schneebaum* argued the cause for appellants. With him on the briefs was *Ralph G. Steinhardt*.

*John B. Bellinger*, *III* argued the cause for appellees. With him on the brief were *Robert N. Weiner*, *Sally L. Pei*, and *R. Reeves Anderson*.

Before: ROGERS and TATEL, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: On May 29, 2010, Plaintiffs—three United States citizens and one foreign national—set sail aboard

the U.S.-flagged ship *Challenger I* as part of the "Gaza Freedom Flotilla." Compl. ¶ 31. The Flotilla's stated aim was to "draw international public attention to the situation in the Gaza Strip and the effect of the [Israeli] blockade." *Id.* ¶ 24. According to Plaintiffs, when the *Challenger I* was approximately seventy nautical miles from the Gaza Strip and still in international waters, Israeli Defense Forces attacked the vessel and detained them in violation of international law. *Id.* ¶¶ 7-11, 28, 40. Seeking to recover for these alleged torts, Plaintiffs filed suit against Israel and its ministries in the United States District Court for the District of Columbia. Israel moved to dismiss under Federal Rule of Civil Procedure 12(b)(1), arguing that it enjoyed immunity from suit under the Foreign Sovereign Immunities Act of 1976 (FSIA). Plaintiffs responded that the FSIA's "non-commercial torts" and "terrorism" exceptions allowed the district court to exercise jurisdiction. Finding neither exception applicable, the district court dismissed the case. *Schermerhorn v. Israel*, 235 F. Supp. 3d 249 (D.D.C. 2017). For the reasons set forth in this opinion, we affirm.

## I.

The FSIA provides "the sole basis for obtaining jurisdiction over a foreign state in our courts." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989). Under the FSIA, foreign sovereigns enjoy absolute immunity from suit unless the case falls within one of several specified exceptions, two of which—the "non-commercial torts" exception, 28 U.S.C. § 1605(a)(5), and the "terrorism" exception*, id.* § 1605A—are at issue in this case. We consider each in turn, "[r]eview[ing] the District Court's sovereign

immunity determination de novo." *Odhiambo v. Republic of Kenya*, 764 F.3d 31, 35 (D.C. Cir. 2014).

## Non-Commercial Torts Exception

The FSIA's non-commercial torts exception confers jurisdiction in any case

> in which money damages are sought against a foreign state for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment.

28 U.S.C. § 1605(a)(5). In this case, the dispositive question is whether Israel's alleged torts—which took place aboard a U.S.-flagged vessel in international waters—"occur[ed] in the United States." *Id.*

Under the FSIA, the "'United States' includes all territory and waters, continental or insular, subject to the jurisdiction of the United States." *Id.* § 1603(c). Although this definition speaks primarily in geographic terms, Plaintiffs argue that it also includes U.S.-flagged ships on the high seas.

Plaintiffs begin by noting that the definition of "United States" is introduced by the word "includes" rather than the word "means." Appellants' Br. 13-15. Invoking the rule of statutory interpretation that "[a] definition which declares what a term 'means' . . . excludes any meaning that is not stated," *Colautti v. Franklin*, 439 U.S. 379, 393 n.10 (1979) (alterations in original) (quoting 2A C. Sands, Statutes and Statutory Construction § 47.07 (4th ed. Supp. 1978)), Plaintiffs contend that the use of "includes" permits us to adopt a broader interpretation of the term "United States." Appellants' Br. 14;

*see also National Wildlife Federation v. Gorsuch*, 693 F.2d 156, 171-72 (D.C. Cir. 1982) (contrasting the "restrictive phrasing" using the word "means" with "the looser phrase 'includes'").

Relying on this interpretative leeway, Plaintiffs contend that a U.S.-flagged ship in international waters is part of the "United States." The determinative test, Plaintiffs assert, is whether a U.S.-flagged ship and the territory and waters of the United States "share a comparable degree of U.S. sovereign control." Appellants' Br. 15. Arguing that they do, Plaintiffs invoke several non-FSIA cases that refer to a ship sailing under a particular country's flag in international waters as constructively part of the flag state's territory. Appellants' Br. 19-20; *see Patterson v. Eudora*, 190 U.S. 169, 176 (1903) ("A ship which bears a nation's flag is to be treated as a part of the territory of that nation." (quoting *Queen v. Anderson*, (1868) L. R. 1 C. C. 161 (U.K.)); *Ross v. McIntyre*, 140 U.S. 453, 464 (1891) ("The deck of a private American vessel, it is true, is considered, for many purposes, constructively as territory of the United States . . . ."). Plaintiffs also point out that a country's law may extend to vessels flying its flag. *See Lauritzen v. Larsen*, 345 U.S. 571, 585 (1953) (holding that Danish tort law extends to a Danish ship because it "is deemed to be a part of the territory of that sovereignty (whose flag it flies)" (quoting *United States v. Flores*, 289 U.S. 137, 155 (1933))).

Were we tasked with identifying the outer limits of the "United States" in general terms, Plaintiffs' arguments might have some merit. But this case requires that we interpret a particular term in a particular law. And, fatal to Plaintiffs' theory, the cases interpreting the FSIA—as opposed to the ones cited by Plaintiffs—not only "counsel[] that [section 1605(a)(5)] should be narrowly construed," *MacArthur Area*

*Citizens Ass'n v. Republic of Peru*, 809 F.2d 918, 921 (D.C. Cir. 1987), but also require that we read the term "United States" in the FSIA to include only the geographic territory of the United States.

Our starting point is the Supreme Court's discussion of the non-commercial torts exception in *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989). That case involved a Liberian-chartered oil tanker traveling from the Virgin Islands to Alaska around Cape Horn in South America during the Falklands War. *Id.* at 431. When the tanker was approximately 600 nautical miles from Argentina, it was attacked by the Argentine military. *Id.* at 431-32. The Liberian companies that owned and chartered the tanker brought suit against Argentina in the United States under the FSIA's non-commercial torts exception, arguing that because the high seas were within the admiralty jurisdiction of the United States, the tort occurred "in the United States." *Id.* at 440. Rejecting that view—and calling into question how Plaintiffs in our case read the term "United States"—the Supreme Court explained that it "construe[s] the modifying phrase 'continental and insular' to restrict the definition of United States to the continental United States and those islands that are part of the United States or its possessions; any other reading would render this phrase nugatory." *Id.*

Of course, as Plaintiffs point out, *Amerada Hess* does not entirely foreclose their position because it primarily addresses whether the term "waters" includes the high seas, *see id.* at 441 ("Because respondents' injury unquestionably occurred well outside the 3-mile limit then in effect for the territorial waters of the United States, the exception for noncommercial torts cannot apply."), whereas they are concerned with whether the term "territory" is capacious enough to include U.S.-flagged vessels. Although the Supreme Court had no occasion to

resolve the question before us—the ship involved was a foreign vessel—it did instruct courts interpreting the term "United States" to give full effect to the "modifying phrase 'continental and insular'" and to "apply '[t]he canon of construction which teaches that legislation of Congress, unless contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States.'" *Id.* at 440 (alteration in original) (quoting *Foley Brothers v. Filardo*, 336 U.S. 281, 285 (1949)).

But even if Plaintiffs' reading of "United States" survives *Amerada Hess*, it is defeated by our court's decision in *Persinger v. Islamic Republic of Iran*, 729 F.2d 835 (D.C. Cir. 1984). There, plaintiffs sought to invoke the non-commercial torts exception with respect to torts that allegedly occurred at the United States Embassy in Tehran, arguing that Congress has "power to exercise jurisdiction over certain activities at U.S. embassies." *Id.* at 839. Although the court acknowledged that "the United States has some jurisdiction over its Embassy in Iran," it rejected plaintiffs' invocation of the non-commercial torts exception because the embassy was not within the territorial United States. *Id.* As the court explained, the use of "the words 'continental or insular' to modify the scope of the phrase 'all territory and waters . . . subject to the jurisdiction of the United States'" is "clearly intended to restrict the definition of the United States to the continental United States and such islands as are part of the United States or are its possessions." *Id.* (alteration in original) (quoting 28 U.S.C. § 1603(c)). This unambiguous language makes plain that the "United States," at least for purposes of the FSIA, is limited to the geographic territories and waters of the United States.

Plaintiffs seek to distinguish *Persinger* on two grounds. First, they argue that unlike the plaintiffs in *Persinger*, they rely on "the unique status of ships" as part of the flag state's

territory "deriving from centuries of legal evolution," rather than the mere fact that the United States exercises "some form of jurisdiction" over U.S. embassies on foreign soil. Appellants' Br. 29. It is true, as Plaintiffs point out, that several cases recognize that "for the purposes of jurisdiction a ship, even on the high seas, is often said to be a part of the territory of the nation whose flag it flies." *Scharrenberg v. Dollar S. S. Co.*, 245 U.S. 122, 127 (1917). But not only are these non-FSIA cases, they caution that "in the physical sense this expression is obviously figurative." *Id.* (rejecting a claim that seamen employed on a ship are working "in the country of its registry" for purposes of a labor law); *see also Lauritzen*, 345 U.S. at 585 ("Some authorities reject, as a rather mischievous fiction, the doctrine that a ship is constructively a floating part of the flagstate . . . ."). Thus, even outside the FSIA context, courts have sometimes rejected attempts to include U.S.-flagged vessels within the statutory definition of "United States," *see, e.g.*, *Cunard S. S. Co. v. Mellon*, 262 U.S. 100, 122, 128 (1923) (holding that the Eighteenth Amendment and National Prohibition Act's restriction on the sale and transport of liquors within "the United States and all territory subject to the jurisdiction thereof" does not include U.S.-registered ships outside territorial waters), and we have no indication that the drafters of the FSIA intended a different result, *see Asociacion de Reclamantes v. United Mexican States*, 735 F.2d 1517, 1525 (D.C. Cir. 1984) (Scalia, J.) (explaining that the legislative history of section 1605(a)(5) indicates that the primary purpose of the exception "was to enable officials and employees of foreign sovereigns to be held liable for the traffic accidents which they cause in this country" (discussing H.R. Rep. No. 94-1487, at 20-21 (1976), *as reprinted in* 1976 U.S.C.C.A.N. 6605, 6619-20)).

Plaintiffs also seek to distinguish *Persinger* on the ground that the U.S. Embassy in Tehran was within the territory of

Iran, and thus necessarily could not be "in the United States." Appellants' Br. 30. *Persinger*'s discussion of what was "in the United States," Plaintiffs argue, is dicta. *Id.* But Plaintiffs misunderstand the court's holding in *Persinger*. Like this panel, the court in *Persinger* was asked to determine whether a particular location was "within the definition of 'United States'" under the FSIA. *Persinger*, 729 F.2d at 839. To resolve that issue, the court set forth a positive account of what the FSIA meant by "United States"—"the continental United States and such islands as are part of the United States or are its possessions"—and determined that U.S. embassies on foreign soil did not fall within that definition. *Id.* Hardly dictum, this discussion was necessary to the court's holding. *See De Csepel v. Republic of Hungary*, 859 F.3d 1094, 1113 (D.C. Cir. 2017) (explaining that "it is not only the result but also those portions of the opinion necessary to that result by which we are bound" (quoting *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 67 (1996))). It would not have been enough, as Plaintiffs suggest, for the court to rely only on the fact that the U.S. Embassy in Tehran was on foreign soil, given that the *Persinger* plaintiffs argued for an interpretation of "United States" that included all areas—including those outside the territorial United States—where the U.S. exercised some jurisdiction.

Bound by *Persinger*'s strictly geographical interpretation of the "United States," we hold that U.S.-flagged ships on the high seas do not fall within the FSIA's non-commercial torts exception. Accordingly, this exception gives Plaintiffs no basis for invoking the district court's jurisdiction in this case.

## Terrorism Exception

Congress first enacted the FSIA's terrorism exception as part of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (codified

as amended in scattered sections of the U.S. Code). As initially drafted, the exception—then codified at 28 U.S.C. § 1605(a)(7)—abrogated a foreign sovereign's immunity in any case

> (7) . . . in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources . . . [if] engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency, except that the court shall decline to hear a claim under this paragraph—
>
>> (A) if the foreign state was not designated as a state sponsor of terrorism under [certain statutes] at the time the act occurred, unless later so designated as a result of such act . . . .

Pub. L. No. 104-132, § 221, 110 Stat. at 1241-43 (codified at 28 U.S.C. § 1605(a)(7) (2006) (repealed 2008)).

Had this case been brought under section 1605(a)(7), Plaintiffs "readily concede that this action would be barred . . . because . . . Israel has never been designated a state sponsor of terrorism by the Government of the United States." Appellants' Br. 32. But Congress amended the FSIA's terrorism exception in 2008, and although the primary impetus for the amendment was to resolve a dispute over whether the exception provided a cause of action directly against a foreign state, *see Owens v. Republic of Sudan*, 864 F.3d 751, 763-65 (D.C. Cir. 2017) (discussing the history of FSIA amendments), Plaintiffs believe that it also eliminated the requirement that a state be designated a sponsor of terrorism for the exception to apply.

As amended by section 1083 of the National Defense Authorization Act for Fiscal Year 2008 (NDAA), Pub. L. No. 110-181, § 1083, 122 Stat. 3, 338-44 (2008) (codified at 28 U.S.C. § 1605A), the revised terrorism exception, now codified at 28 U.S.C. § 1605A, provides in relevant part:

(1) No Immunity.—A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case not otherwise covered by this chapter in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

(2) Claim heard.—The court shall hear a claim under this section if—
(A)(i)(I) the foreign state was designated as a state sponsor of terrorism at the time the act described in paragraph (1) occurred . . . .

28 U.S.C. § 1605A(a) (2012).

Although section 1605A(a) and its predecessor section 1605(a)(7) are nearly identical, Plaintiffs emphasize the slight shift from the double negative construction of the old exception—"the court *shall decline* to hear a claim . . . if the foreign state *was not* designated as a state sponsor of terrorism"—to the affirmative, two-sentence construction of the new exception—"The court *shall* hear a claim . . . if . . . the

foreign state *was* designated as a state sponsor of terrorism." According to Plaintiffs, by so revising the exception, Congress established a two-tiered approach to jurisdiction. The first sentence, section 1605A(a)(1), strips all foreign states of immunity in cases involving "personal injury or death" caused by certain specified terroristic acts. And the second sentence, section 1605A(a)(2), provides that when certain other conditions are met, such as when the defendant state is designated a state sponsor of terrorism, a court has no choice but to hear the case. Read together, these sentences, Plaintiffs argue, mean that when a case is brought only under section 1605A(a)(1), a court still has discretion to dismiss the case on grounds such as political question, act of state, or forum non conveniens; by contrast, a court must hear cases that fit the criteria of section 1605A(a)(2). And although Plaintiffs agree that their case does not qualify as one the district court must hear, they contend that the court should have considered whether it might nonetheless have jurisdiction under section 1605A(a)(1).

Plaintiffs' reading of the statute is intriguing. Treating each sentence in isolation, as Plaintiffs urge, we could read section 1605A(a)(1) as establishing a seemingly unqualified abrogation of sovereign immunity and section 1605A(a)(2) as providing only when cases *must* be heard.

But this construction of the statute simply cannot be correct. The FSIA is premised on "a presumption of foreign sovereign immunity" qualified only by a small number of "discrete and limited exceptions." *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 87-88 (D.C. Cir. 2002) (collecting cases). As our court has explained, the terrorism exception, in particular, represents a "delicate legislative compromise" that rests in part on the fact that "only a defendant that has been specifically designated by the State Department

as a 'state sponsor of terrorism' is subject to the loss of its sovereign immunity." *Id.* at 89 (quoting 28 U.S.C. § 1605(a)(7)(A)) (discussing the historical evolution of the FSIA).

Yet under Plaintiff's view, Congress, without any acknowledgement whatsoever, abandoned this longstanding compromise and authorized victims of alleged terrorism to bring suit against any state without regard to its designation as a state sponsor of terrorism. Asked at oral argument whether they knew of any support in the legislative history for their reading, Plaintiffs' counsel conceded they knew of none. *See* Oral Arg. 12:27-33 ("There is nothing that we have been able to find in the legislative history that discusses this either way."). In fact, the only relevant legislative history discusses the terrorism exception as though the state-sponsor requirement remains a mandatory prerequisite to invoking jurisdiction. *See Ensuring Legal Redress for American Victims of State-Sponsored Terrorism: Hearing on Victims of State-Sponsored Terrorism Before the H. Comm. on the Judiciary*, 110th Cong. 6 (2008), *available at* 2008 WL 2441390 (statement of Rep. Bruce Braley) (explaining that under the proposed amendment Iraq faced "no threat of future claims since Iraq is no longer designated as a state sponsor of terrorism").

Plaintiffs' reading of section 1605A is all the more implausible given that it would require discarding not just the state-sponsor prerequisite, but also other longstanding prerequisites to invoking the terrorism exception. Although this case concerns only the state-sponsor prerequisite, former section 1605(a)(7)—now section 1605A(a)(2)—listed several other requirements for invoking the exception. For instance, section 1605(a)(7)(B) provided that, even if a foreign state was designated a sponsor of terrorism, "the court shall decline to

hear a claim . . . if . . . neither the claimant nor the victim was a national of the United States . . . when the act upon which the claim is based occurred." 28 U.S.C. § 1605(a)(7)(B)(ii) (2006). After eliminating the double negative, the NDAA amendment carried this language into section 1605A(a)(2) in the clause just after the state-sponsor requirement. *See id.* § 1605A(a)(2)(A)(ii)(I) ("The court shall hear a claim under this section if . . . the claimant or the victim was . . . a national of the United States . . . ."). Under Plaintiffs' interpretation of section 1605A(a)—which reads the provisions of section 1605A(a)(2) as establishing only when a court must hear a case but not limiting when a court may hear such a case—this requirement would also no longer be a necessary prerequisite to invoking the court's jurisdiction.

The implications of Plaintiffs' reading of section 1605A(a)(1) are breathtaking. Without the state-sponsor and U.S.-national requirements, individuals with no connection at all to this country could bring suit here against any foreign sovereign, including a U.S. ally, for any injury or death caused by an "act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act." *Id.* § 1605A(a)(1). As counsel for Israel pointed out at oral argument—and Plaintiffs' counsel agreed—this would mean that "if a foreign national is concerned that someone has been killed in Iraq or Afghanistan by the British, that would be an extrajudicial killing and this court would have jurisdiction." *Compare* Oral Arg. 23:46-24:02 (raising hypothetical), *with id.* 30:54-31:21 ("Congress opened the door to that kind of suit.").

Although Congress may one day decide that the state-sponsor and U.S.-national requirements are no longer necessary, we cannot conclude from an unexplained editorial change that it has already done so. Such "[f]undamental

changes in the scope of a statute are not typically accomplished with so subtle a move." *Kellogg Brown & Root Services Inc. v. United States ex rel. Carter*, 135 S. Ct. 1970, 1977 (2015). Rather, the FSIA's terrorism exception continues to apply only to a foreign state "designated as a state sponsor of terrorism at the time the act . . . occurred, or was so designated as a result of such act." 28 U.S.C. § 1605A(a)(2)(A)(i)(I).

Given the consequences of Plaintiffs' interpretation, it is unsurprising that no court has countenanced such a reading of the terrorism exception after the NDAA amendment. Rather, cases in this circuit and elsewhere have continued to treat the state-sponsor requirement as a jurisdictional prerequisite to invoking the terrorism exception. *See, e.g.*, *Owens*, 864 F.3d at 777 ("§ 1605A strives to hold designated state sponsors of terrorism accountable for their sponsorship of terror . . . ."); *Mohammadi v. Islamic Republic of Iran*, 782 F.3d 9, 14 (D.C. Cir. 2015) ("The exception further requires that (i) the foreign country was designated a 'state sponsor of terrorism at the time [of] the act' . . . ." (quoting 28 U.S.C. § 1605A(a)(2))); *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 109, 115 n.7 (2d Cir. 2013) (explaining that section 1605A "is only available against a nation that has been designated by the United States government as a state sponsor of terrorism at the time of, or due to, a terrorist act"); *Doe v. Bin Laden*, 663 F.3d 64, 65 (2d Cir. 2011) (finding it undisputed that section 1605A "is not available against Afghanistan . . . because the State Department has not designated Afghanistan as a state sponsor of terrorism"). Although none of those cases squarely confronted the precise argument before us, they provide further support for the proposition that this slight revision to the terrorism exception did not bring about the dramatic departure from well-established FSIA practice that Plaintiffs seek.

15

## II.

For the foregoing reasons, the judgment of the district court is affirmed.

*So ordered.*